ORIGINAL 530

PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY **FILED**

Name HERNANDEZ,                BENJAMIN

(Last)                        (First)

APR 1 6 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Prisoner Number  E-51808

Institutional Address CORRECTIONAL TRAINING FACILITY, CTF II(C),

Z-319L, P.O. BOX 689, SOLEDAD, CA 93960-0689

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**PJH**

CV 08    1979

BENJAMIN HERNANDEZ,              Case No. _____
Full Name of Petitioner          (To be provided by the clerk of
                                 court)
                                         **(PR)**

                vs.              E-filing

B. CURRY, Warden, B.P.H. COMMISSIONERS    PETITION FOR A WRIT OF HABEAS CORPUS
Name of Respondent
(Warden or jailor)

=================================================================

Read Comments Carefully Before Filling In

When and Where to File

    You should file in the Northern District if you were convicted
and sentenced in one of these counties:  Alameda, Contra Costa, Del
Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San Benito,
Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma.  You
should also file in this district if you are challenging the manner in
which your sentence is being executed, such as loss of good time
credits, and you are confined in one of these counties.  Habeas L.R.
2254-3(a).

    If you are challenging your conviction or sentence and you were
not convicted and sentenced in one of the above-named fifteen
counties, your petition will likely be transferred to the United
States District Court for the district in which the state court that
convicted and sentenced you is located.  If you are challenging the
execution of your sentence and you are not in prison in one of these
counties, your petition will likely be transferred to the district
court for the district that includes the institution where you are
confined.  Habeas L.R. 2254-3(b).

Who to Name as Respondent

You must name the person in whose actual custody you are. This usually means the Warden or jailor. Do not name the State of California, a city, a county or the superior court of the county in which you are imprisoned or by whom you were convicted and sentenced. These are not proper respondents.

If you are not presently in custody pursuant to the state judgment against which you seek relief but may be subject to such custody in the future (e.g., detainers), you must name the person in whose custody you are now and the Attorney General of the state in which the judgment you seek to attack was entered.

A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

1. What sentence are you challenging in this petition?

(a) Name and location of court that imposed sentence (for example; Alameda County Superior Court, Oakland):

SUPERIOR COURT OF CALIFORNIA        LOS ANGELES
_____Court_____                _____Location_____

(b) Case number, if known # A975792.

(c) Date and terms of sentence INCIDENT ON 1/14/89; REC. IN C.D.C.R. 4/13/90. LIFE TERM BEGAN; 10/13/92.

(d) Are you now in custody serving this term? (Custody means being in jail, on parole or probation, etc.) Yes _X_ No ____

Where? CORRECTIONAL TRAINING FACILITY, CTF II(C), SOLEDAD, CA.
       (Name of Institution)                (Address)

2. For what crime were you given this sentence? (If your petition challenges a sentence for more than one crime, list each crime separately using Penal Code numbers if known. If you are challenging more than one sentence, you should file a different petition for each sentence.)

SECOND DEGREE MURDER; KNIFE USE ALLEGATION.

2ND, DEG. MUR.; CAL.P.C. § 187; KNIFE U/A; 1022B.

3. Did you have any of the following?

Arraignment: Yes _X_ No ____   Preliminary Hearing: Yes _X_ No ____

Motion to Suppress: Yes _X_ No ____

4.    How did you plead?

Guilty ____    Not Guilty __X__    Nolo Contendere ____

Any other plea (specify) _____

5.    If you went to trial, what kind of trial did you have?

Jury __X__    Judge alone ____    Judge alone on a transcript ____

6.    Did you testify at your trial?    Yes __X__    No ____

7.    Did you have an attorney at the following proceedings:

(a)    Arraignment    Yes __X__    No ____
(b)    Preliminary hearing    Yes __x__    No ____
(c)    Time of plea    Yes ____    No ____
(d)    Trial    Yes __x__    No ____
(e)    Sentencing    Yes __X__    No ____
(f)    Appeal    Yes __X__    No ____
(g)    Other post-conviction proceeding    Yes ____    No __X__

8.    Did you appeal your conviction?    Yes __X__    No ____

(a)  If you did, to what court(s) did you appeal?

Court of Appeal    Yes __X__    No ____    __1990-91?    CONV. AFFIRMED.__
                                              (Year)        (Result)

Supreme Court of
California    Yes ____    No __x__    _____
                                          (Year)          (Result)

Any other court    Yes ____    No __x__    __ONLY VS. B.P.H._____
                                              (Year)          (Result)

(b)  If you appealed, were the grounds the same as those that you are raising in this petition?    Yes ____    No ____

(c)  Was there an opinion?    Yes ____    No ____

(d)  Did you seek permission to file a late appeal under Rule 31(a)?    Yes ____    No ____

If you did, give the name of the court and the result:

_____

9.    Other than appeals, have you previously filed any petitions, applications or motions with respect to this conviction in any court, state or federal?    Yes ____    No __x__

Note:  If you previously filed a petition for a writ of habeas corpus in federal court that challenged the same conviction you are challenging now and if that petition was denied or dismissed with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit for an order authorizing the district court to consider this petition.  You may not file a second or subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit.  28 U.S.C. § 2244(b).

(a)  If you sought relief in any proceeding other than an appeal, answer the following questions for each proceeding.  Attach extra paper if you need more space.

I.    Name of Court _____

Type of Proceeding _____

Grounds raised (Be brief but specific):

a. _____

b. _____

c. _____

d. _____

Result _____ Date of Result _____

II.   Name of Court _____

Type of Proceeding _____

Grounds raised (Be brief but specific):

a. _____

b. _____

c. _____

d. _____

Result _____ Date of Result _____

III.  Name of Court _____

Type of Proceeding _____

Grounds raised (Be brief but specific):

a. _____

b. _____

c. _____

d. _____

Result _____     Date of Result _____

    (b) Is any petition, appeal or other post-conviction proceeding now pending in any court?  Yes _____  No _x_

_____
(Name and location of court)

B.  GROUNDS FOR RELIEF

    State briefly every reason that you believe you are being confined unlawfully.  Give facts to support each claim.  For example, what legal right or privilege were you denied?  What happened?  Who made the error?  Avoid legal arguments with numerous case citations. Attach extra paper if you need more space.  Answer the same questions for each claim.

    Note:  You must present ALL your claims in your first federal habeas petition.  Subsequent petitions may be dismissed without review on the merits.  28 U.S.C. § 2244(b); McCleskev v. Zant, 499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).

    Claim One: PETITIONER'S DUE PROCESS CLAUSE RIGHTS VIOLATED BY THE

B.P.H. AND STATE COURTS ON P.H.C., (U.S. CONST. AMEND. XIV.)

    Supporting Facts THE USE OF "SOME EVIDENCE" TESTS PRINCIPLE BY THE

B.P.H. AND THE COURTS ON DE NOVO REVIEW, IS A VIOLATION OF LONG &

CLEARLY ESTABLISHED U.S. SUPREME COURT PRECEDENT, PETITIONER IS SUIT-

ABLE FOR PAROLE BUT CANNOT EVEN GET FOUND AS SUCH. THE B.P.H. COMMIS-

SIONERS PRACTICE A "NO PAROLE POLICY," BY **INCOMPETENCE, FELONY OR BOTH.**
(PLEASE SEE ADDENDUM I. ATTACHED.)

_____

    Supporting Facts: _____

_____

_____

_____

5

ADDENDUM   I

ADDENDUM   I

ADDENDUM   I

1

## ARGUMENT I.

2      THE USE OF THE SO-CALLED "SOME EVIDENCE" TEST
    PRINCIPLE BY THE B.P.H. AND COURTS ON **REVIEW**
3      IS UNCONSTITUTIONAL, BECAUSE THE "PREPONDERANCE
    OF EVIDENCE" AND "SUBSTANTIAL EVIDENCE" STAND-
4      ARDS OF PROOF ARE MANDATED ON HABEAS CORPUS AND
    CIVIL LAW COMPLAINT  SUITS BY FEDERAL LAW.

5

6  A.     The California Board of Parole Hearings, uses the "Some

7  Evidence" Test Principle (a modicum of proof), in its parole suit-

8  ability hearings in the California Department of Corrections and

9  Rehabilitation, for DSL (Determinate Sentence Law) parole suitabi-

10  lity candidates sentenced to life-top terms in the State's pri-

11  sons. "Some Evidence" is described in case law as a (modicum of

12  proof), By using this 'test principle', the Board and Courts are

13  misinterpreting clearly established United States Supreme Court

14  precedent setting case law, because the Court has abandoned the

15  "Preponderance of Evidence" standard of proof, in deciding habeas

16  corpus petitions. (Please see, <u>Superintendant v. Hill</u>, 472 U.S.

17  455 (1985); <u>In re Powell</u>, (1988) 45 Cal.3d. 894; 248 Cal. Rptr.43i

18  (Cal. 1988); <u>Trantino v. New Jersey State Parole Board</u>, 764 A.2d.

19  943, 976 (2001); "Substantial Evidence" mandatory on habeas corpus

20  review." Furhtermore:

21      "¶ Unlike the circumstances in <u>Hill</u>, the statutory and regu-

22  ulatory scheme in California requires the application of a "prep-

23  onderance of the evidence" standard. For example, the C.D.C.R. it-

24  self utilizes a preponderance standard for a finding of guilt in

25  disciplinary matters. California lawmakers have determined that a

26  prisoner's liberty interest that is in a disciplinary hearing, re-

27  quires that the finding of guilt <u>must be supported by a preponder-</u>

28  <u>ance of the evidence.</u> (Tit. 15, § 3320.)

1  B.       In fact, the constitutionally mandated standard of proof
2  has ALWAYS been preponderance of evidence on habeas corpus de novo
3  review in all the States of the Union and in Federal Courts, ex-
4  cept where the issues presented are dealing with matters of more
5  importance than "merely money"; Santovsky v. Kramer, (1982) 955
6  U.S. 745, 767-769, 102 S.Ct. 1388; Addington v. Texas, 441 U.S. @
7  424, 99 S.Ct. @ 1868; Goldberg v. Kelly, 317 U.S. 259, 262-263,
8  90 S.Ct. 1011, 1017-1018, 25 L.Ed.2d 287 (1970); Joint Anti-Fas-
9  cist Refugee Committee v. McGrath, 341 U.S. 125, 168, 71 S.Ct.624
10 646, L.Ed.817 (1951) [Frankfurter Concurring]; Davis v. Board of
11 Parole and Post-Prison Supervision, 200 Or. App. 366, 371-373,
12 114 P.3d 138 (2005) ["Clear and Convincing  Evidence required."];
13 and Rule 5 of Rules Governing  Habeas Corpus Procedures, pursuant
14 to 28 U.S.C. §§ 2254-55. For matters dealing with such critical
15 issues as liberty and freedom, the standard of evidence must be
16 "clear and convincing" proof. In all the laws and statutes Peti-
17 ioner's Layman Assistant has read; except for cases dealing with
18 the California Board of Parole Hearings, the standard of proof
19 has always been "preponderance of evidence" on habeas corpus.
20 Although, Title 15, Div. Two, § 2000(50); states that; "in all
21 decisions taken by the Panels, preponderance of evidence must be
22 used...", Respondents may say, "In the California B.P.H. regula-
23 tions, there is no specific standard of proof defined in the par-
24 ole consideration hearing process. However, California law is ex-
25 plicit as to what the standard of proof is in any Board Panel
26 proceedings when no specific standard is defined. California Evid-
27 ence Code § 115 provides that if a standard of proof is not spe-
28 cified, the standard used is "Preponderance of Evidence."

1   1.    In its discussion in the case of In re Powell, supra,
2 the Supreme Court of California  revealed why it used the 'new'
3 "some evidence" test principle in THAT case:  Powell  came off
4 Death Row after Death was outlawed in California. He was told by
5 the Board then, that if he stayed 'clean', he would get a parole
6 date! THEN, the movie 'The Onion Field Killers' aired! The public
7 had a fit! Couldn't permit him out! Ergo: "some evidence" ! He died
8 in prison. Contemporaneously, the continued use of "some evidence"
9 Test Principle is untenable. When Powell @ 436-437, was ruled and
10 decided upon by the Cal. Supreme Court, it cited Hill, supra,472
11 U.S. 455 (1985); stating "Some Evidence" 'trumps' "Independent
12 Judgment standard" in "administrative" institutional hearings be-
13 cause, "That standard applies only when an administrative decision
14 affects a vested right." (See, eg.; Bixby v. Pierno, (1971) 4 Cal
15 3d. 130, 144-46, 93 Cal.Rptr.234, 481 P.2d.242)" "A prison inmate
16 has no vested right in his prospective liberty on a parole rel-
17 ease date." (Fain I., Supra, 65 Cal.App.3d. @ p.390, 135 Ca;.Rptr.
18 543; See, In re McClain, Supra, 55 Cal.2d. 78, 87, 9 Cal.Rptr.824,
19 357 P.2d.1080)." But these statements are untrue now, in lieu of
20 the Courts' findings in the cases of In re Ramirez, 94 Cal.App.
21 4th.549 @ p.564 fn 5  In re Ernest Smith, at p.683; Biggs v. Ter-
22 hune, 334 F.3d.910 (9th.Cir.2006); Sass v. Cal. Board of Parole
23 461 F.3d.1123 (9th.Cir.2006); Trantino v. New Jersey State Parole
24 Board, 764 A.2d.940 (2001); and Hamdi v. Rumsfeld, 124 U.S. 2633
25 and 2650, 2651; plus, McQuillon v. Duncan, 306 F.3d.@ 902), inter
26 alia. Prisoners going before the B.P.H. for parole consideration
27 DO have a protected liberty interest in parole! Everyone knows
28 this: they just WISH it were not so!

5(c)

GROUND 1 (Cnt.):

1      The Holding now applies to lifers no matter the facts of their
2   specific case[s]. Often, the target case, in this case Powell,
3   Supra, is so truly heinous and egrigious, that no one cared that
4   a contract was being violated through the use of manipulative
5   legal language and case law. Predictably, the neglect to insist
6   on strict adherence to the constitution and laws already on the
7   books have come  rumbling downhill  in an out of control ava-
8   lanche of confusing  convoluted 'new' rules and laws; in viola-
9   tion of Stare Decisis, i.e.;"Once a law has been created it be-
10  comes a law Americans can count on...."  Not the case here...!

11     Petitioner knows of no other state whose parole statutes
12  provide a protected liberty interest in parole, or any defined
13  liberty interest extinguishable by the mere presence of any evid-
14  ence whatsoever. In fact, the opposite is true. Why, even in the
15  case of an alleged Enemy Combatant, the U.S. Supreme Court, Just-
16  ice, Hon. Sandra Day O'Connor, wrote in the case of Hamdi v. Rums-
17  feld, supra, on page 2351, that; ¶"Because we conclude that due
18  process demands some system for a citizen detainee to refute his
19  classification, the proposed "some evidence" standard is inade-
20  quate. Any process in which the Executive's factual assertions
21  go wholly unchallenged or are simply presumed correct without
22  any opportunity for the alleged combatant to demonstrate other-
23  wise falls constitutionally short. As the Government itself has
24  recognized, we have utilized the "some evidence" standard in the
25  past as a standard of review, not as a standard of proof..."
26  See, e.g., St. Cyr, 533 U.S. at 301, S.Ct. 2271. ("At its historical
27  core, the writ of habeas corpus has served as a means of reviewing the legali-
28  ty of Executive detention, and its in that context that its protections have

1 "been the greatest..."); quoted in <u>Hamdi</u>, supra, on p. 2650.

2    Petitioner hereby petitions the Court for an **evidentiary hea-**

3 **ring**, to revisit the Holding in the case of <u>In re Powell</u>, to

4 remedy his unlawful and unconstitutional confinement resulting

5 from the refusal of the Board of Parole Hearings to make a find-

6 ing of parole suitability and afford Petitioner a parole release

7 date. The instrument of its no-parole-policy being the aforemen-

8 tioned, "some evidence" test principle which effectively torpe-

9 does all but less than 1% of all eligible life top prisoners "from

10 ever seeing the light of day on parole..." (quote made by Mr.

11 James Tilton, Director of the California Department of Correc-

12 tions & Rehabilitation to the victims rights group members gath-

13 ered at Correctional Training Facility (CTF II) on September 25,

14 2007, during the protest against granting of a Parole Release

15 date to Inmate Kerry Conley, at this location.) Mr. Tilton, ad-

16 dressed the crowd and this speech was aired on KION TV, Channel

17 46. In that speech, the Director of the C.D.C.R. told the vic-

18 tims rights representatives that prisoners only have a due pro-

19 cess right to have a hearing; not parole [i.e. no Protected Lib-

20 erty Interest], and that "Of the 4000... hearings we'll hold

21 this year less than 1% of these men will ever see the light of

22 of day..." This is a Governor Wilson, Gov. Davis-like declara-

23 tion that all lifer hearings are <u>pro forma</u> and <u>sub rosa</u>, Tilton

24 reaffirmed the truth we all recognize as overt Executive Branch

25 policy. The goal is the same; NO Paroles; the tool is the "some

26 evidence" test principle declared law in <u>Powell</u>. But the real

27 travesty is that the State's Courts have allowed these political

28 machinations to contaminate the Constitutions and laws....

PETITION FOR WRIT OF HABERS CORPUS
GROUND 1 (Cont.):

1  C.       In his Petition (p. 3(e),) Petitioner then made a pro-

2  phetic finding when he iterrated that "the D.A,'s Rep. nor the

3  Commissioners during the hearing are at liberty to aggravate the

4  commitment offense more than was found at trial by a lawful Court;

5  According to the BOARD's own regulations (Title 15 C.C.R. §§ 2282-2284,);

6  prophetic, because last January, 2007, the United States Supreme

7  Court HELD in a 6-3 majority, that "only a jury may aggravate

8  a term..." Now, the Cabal of Commissioners say they are not a

9  Court; when the pressure is on; They are a "quasi-judicial" Body.

10  But when confronted with their misdeeds, they claim "absolute

11  immunity", as IF they were REAL Judges; instead of ex-cops play-

12  ing God with peoples' lives. Petitioner says they can't have it

13  both ways!! (Please see, Cunningham v. California, 127 S.Ct.865;

14  also, Ex Parte v. Bertrand, 61 Cal. App.2d 183, 142 P.2d 351

15  (1943); "[The Board of Parole Hearings is "a ministerial Body..."] and are

16  not a Judicial or Legislative Body; and may therefore, neither write law,nor

17  interpret law. (See, Cal. P.C. § 5077 (annotated).)

18      The Board only considers "circumstances in Mitigation/

19  Aggravation of the Base Term", after it has determined the Pris-

20  oner suitable for parole: § 2282, BASE TERM. Obviously, in these

21  "cart before the horse", pro forma hearings, that suitability

22  will never happen. The raw fact is, exemplary comportment means

23  nothing; '0' in these hearings. NOTHING is enough to "outweigh"

24  the commitment offense and prior. The "escalating pattern of

25  criminal conduct and he also failed to profit from society's

26  previous attempt to correct his criminality" (R.T. pp. 52-53).

27  But all that was PRIOR to his outstanding rehabilitative conduct

28  in the preceding 15 years. Fifteen years is a LONG TIME!

1    D.    As long as the current state of affairs persists in place
2  within the Board of Parole Hearings and reviewing courts, Petitioner
3  -- and thousands more like him will have their sentences continuously
4  and retroactively increased in an <u>ex post facto</u> law violative manner,
5  pursuant to Art. 1 §§ 9-10, U.S. Constitution; and because they are re-
6  peatedly re-sentenced after re-conviction, the <u>Double Jeopardy</u> Clause,
7  Amendment V, U.S. Constitution is also violated. These violations all
8  contribute to the <u>Due Process</u> Clause violations of the XIVth. Amend-
9  ment, United States Constitution, as will be demonstrated herein:

10                    PETITIONER'S CONSTITUTIONAL CLAIMS

11        1.    Petitioner has been deprived of Due Process by the
12  purposeful misapplication of the "some evidence standard" for determin-
13  ing parole suitability of life prisoners in the State of California's
14  Department of Corrections & Rehabilitation/institutions, as determined
15  by the United States District Court, Northern District of California
16  in its <u>Rosenkrantz</u> decision, recently, enforced by the United States
17  Court of Appeals for the Ninth Circuit, in the case of <u>McQuillon v.</u>
18  <u>Duncan</u>, 306 F.3d. 895, 903 (2002); subsequently clarified in <u>Biggs v.</u>
19  <u>Terhune</u>, 269 F.3d. 972; (Please see, <u>Phifer v. Warden, U.S. Peniten-</u>
20  <u>tiary, Terre Haute, Indiana</u>, 53 F.3d. 859 (7th.Cir. 1995)).

21        2.    Petitioner has been deprived of Due Process by the
22  "arbitrary and capricious" denial of parole suitability based on
23  unsupported descriptive language offered in a "boilerplate" misrepre-
24  sentation of facts covered by that very Panel on the day of the Hear-
25  ing, and co-extensive with that found "arbitrary and capricious" in
26  the <u>Ramirez</u> case.

27        3.    Petitioner has been deprived of Due Process by the
28  creation of a protected liberty interest because of continued applica-

                          5(g)

PETITION FOR WRIT OF HABEAS CORPUS
GROUND 1 (Cont.):

1   tion in an "arbitrary and capricious" manner in the way his parole

2   suitability hearing [s] have been conducted; as is the case of

3   hundreds, if not thousands of other like hearings in the State of

4   California by the B.P.H.; and in contravention of the available

5   evidence in refusing to find him even suitable for parole. (See,

6   Declaration of former Chairman of Board of Prison Terms, Hon. Mr

7   Leddy, and Ms. Monica Knox, Esq., U.S. Public  Defender, United

8   States District Court Central District of California (at the time

9   of her Declaration) (Please see, Exhibits  **C & D, attached.)**

10         4.    Petitioner has been deprived of Due Process by

11  the intentional adoption of a policy and practice illegally

12  denying even the most deserving petitioners parole suitability,

13  or transfers home, for political reasons. (See Exh. B.)

14         5.    Petitioner has been deprived of Due Process by <u>ex</u>

15  <u>post facto</u> application of far more severe restrictions for re-

16  lease on parole than existed at the time of the offenses while

17  applying the "some evidence standard" unlawfully in their deter-

18  minations, thus substantially increasing the amount of incarcera-

19  tion indefinitely: a fact petitioner, nor his lawyer, nor the

20  Court at sentencing were aware of: this gross Due Process viola-

21  lation is prohibited by long established United States Supreme

22  Court precedent setting case law; <u>Bouie v. City of Colombia</u>,

23  <u>supra.</u> 378 US 347, 12 L.Ed. 2d. 894, 84 S. Ct. 1697 (1964).

24         6.    Petitioner is not sophisticated, or wise; but ev-

25  en rats know when to abandon a sinking ship. Considering Petition-

26  er's age and 'other' handicaps, it is clear with  these commis-

27  sioner's and his inability to reach the 'goals' imposed on him; he

28  will <u>never</u> be 'suitable for parole": isn't that the plan?

1   Now, the BOARD commissioners are also not rocket scientists, as
2   shown herein;    ante, but they are policeman shrewed. Their tactics
3   are also not new or innovative. But they can be effective, until force-
4   fully regulated by persons with more power than they possess. Case in
5   point; After the American Civil War, during Reconstruction, when the
6   former slaves were first given the right to vote by the victorious
7   Union; the former slave owners and the defeated soldiers of the Confed-
8   eracy devised several ways of frustrating this 'right' of their ex-
9   chatel slaves to 'vote' them out of power; which they had promptly
10  regained once the fighting and heavy occupation ceased. They invented
11  poll taxes which the blacks, who were basically, still slaves, could
12  never hope to afford. They also conjured poll exams for the blacks,
13  that even an educated white man could never hope to pass. They passed
14  'Jim Crow' laws meant to reinslave the former slaves to them. They
15  thought they were clever too. This period in history is known as the
16  Second Reconstruction; or the Southern Reconstruction. It took the
17  reintroduction of Federal troops, the defeat of the KKK and other
18  organizations like them, and the passing of the Fourteenth Amendment
19  to the United States Constitution, to insure that the former slaves
20  could realize their Due Process Clause Rights as citizens of the 'new'
21  America. And of course, isn't this what these modern second reconstruc-
22  tionists are doing: making it impossible for all but a 'figleaf' few of
23  prisoners serving life top terms in the CDCR to ever see the light of
24  freedom, no matter how deserving the prisoner?

25  But, thank God, the Fourteenth Amendment is still good law for
26  "disfavored" persons to turn to when faced with people who think they're
27  above the law: who believe in fact, they are "Übermensch", and not
28  subject to the 'common' law.

1    The tactic of creating an "üntermenschen" class of people,
2    then convincing a society it is O.K. to run roughshod over their
3    constitutionally protected liberty interests, is still with us in
4    spite of events in recent history. That is exactly what Adolf
5    Hitler tried to do when he outlawed the Weimar Republic democrat-
6    ic courts in Germany and replaced them with 'new' "Volksgerichts-
7    hof" and "Landsgerichtshof" appeal courts, manned by 100% members
8    of the National Socialist Party [Nationalsocialistischen Partei
9    -NAZIs] ; to guarantee 100% conviction **rates against Jews, Gypsies,**
10   Slavs and 'real' criminals. If you were charged, you were convic-
11   ted. If by some miracle you 'beat' the charges, a black limo was
12   waiting outside the court house to whisk you away to a Vernicht-
13   ungslager: (extermination camps). There is <u>NOTHING</u> NEW UNDER THE
14   SUN. Is that what like-minded groups in our country are planning?
15   (Please see, 'The Rise and Fall of the Third Reich, by William L.
16   Shirer.) People make mistakes in their lives; sometimes catastro-
17   phic mistakes. That is why we have democratic courts: to deter-
18   mine the seriousness of the offense[s] and to set the appropriate
19   sentences after a lawful trial. As long as a prisoner does not
20   reoffend by injuring another person; or does not get involved in
21   further felonious activity in prison, but rather serves his time
22   as well as he can in the negative invironment of prison; then he
23   has earned parole. Who told the B.P.H. they could retry & recon-
24   vict him each time he appears before the BOARD's panels?

25       The denial of parole to Petitioner was predicated on the
26   following factors:

27           1. 'And Sir, the panel has reviewed all the
               information from the public and relied on
28           the following circumstances in concluding
               that the inmate is not suitable for parole

"and puts an unreasonable risk of danger to society or a threat to public safety if released from prison...."

2. "And specifically, as it relates to the commitment offense, the offense was carried out in a [sic]specially cruel and callous manner in that the inmate pulled a knife during during a[n] altercation with the victim, his brother, and other individuals who were at the scene. The inmate proceeded to stab the victim several times which led to his death."

3. "The offense was carried out in a dispassionate manner. In that the inmate and his brother, after [t]he inmate stabbed the victim, left the scene without trying to give and aid to the victim or even learning of his condition."

4. "The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering, in that flailing this knife the inmate could have injured other people and the inmate had an opportunity to not draw his knife and stab the victim and he also could have not engaged in the fight to begin with."

5. "The motive for the crime is inexplic- and it[']s trivial. I still don't under- stand how this stabbing happened or why it happened. We have an argument for donuts; we have an argument, a long standing argument between him and his brother..."

6. "The inmate has an escalating pattern of criminal conduct and he also failed to profit from society's previous attempts to correct his criminality in these attempts include, adult probation as well as a prior prison term."

7. "And the inmate has unstable social history and prior criminality which includ- es a proclivity for carrying concealed weapons, robbery, grand theft auto, and he actually was on probation for carrying a concealed weapon <u>at the time of the offense</u>."

8. "The inmate has programmed in a limited manner while incarcerated and has failed to develop an[d] marketable skill that could be put to use upon his release. He has also failed to upgrade educationally

"and vocationally as previously recommend-
ed by the BOARD. And we do recognize that
there are limitations with the language,
with the fact that you are not fluent in
English."

9. "The psychological report dated July
5, 2001 authored by Doctor Silverstein, is
favorable in that he says the inmate is
less likely than most to re-offend and
that he has a better than average chance
of success in the community. And although
the inmate appears to have realistic
parole plans in Mexico, he does not have
viable residential plans in the county of
last legal residence and we do not have a
documented and verifiable evidence of
residence in Mexico or California. He does
not have acceptable employment plans,
again, we see nothing documented about
employment plans. And he does not have a
marketable skill. In addition, the hearing
panel notes that, in response to 3042
notices, opposition to a finding of parole
suitability has been expressed by the
district attorney of Los Angeles County.
And the panel makes the following findings,
the inmate needs therapy in order to face,
discuss and understand and cope with
stress in a nondestructive manner. Until
progress is made the inmate continues to
be unpredictable to others..."

The aforementioned factors in aggravation, cement Peti-
tioner's statement on page 5(h) [last paragraph], that  "with
the commissioners described herein, and his inability to
accomplish the 'goals' illegally placed on him he will <u>never</u>
be suitable for parole", and he will serve LWOP in prison.

    **E.**   However, Petitioner would like to <u>briefly</u> go
over the denial factors to support his assertion:

    1.   All but two of the factors in denial deal
with the commitment offense and priors, and those factors
can never change.

    2.   The favorable psychological report was

1   mentioned in passing; and then ignored. This is not a conclusion-
2   ary observation. In fact, Mr. Dennis Kenneally, expressed the
3   'true' lack of respect and validity the B.P.H. holds the psycho-
4   logical evaluations in   [Memo retracted FAST!]   Mr. Kennealy,
5   had authorized his commissioners to : ignore psychological reports,
6   and to not postpone hearings in the future for lack of timely and
7   or   favorable reports because "You may disregard any opinion if
8   you find it to be unreasonable....¶ Psychological reports shall
9   not be ordered for the purposes of evaluating parole suitability
10  of non-MHSDS (Mental Health Services Delivery System) Inmates."
11  In the past any "not totally supportive" psychological evaluation
12  was enough to deny parole. Now if this policy was not reversed,
13  even "favorable reports" were to be treated with disdain.

14          3.   The BOARD knows full well, that if Petitioner
15  is ever paroled in-spite of their energetic efforts by the B.P.H.
16  to the contrary; he will be deported to his home country of
17  Mexico, where he is owner of a home, and has family members who
18  will lend him support. Yet the BOARD used the fact that Petition-
19  er "has unstable social history..." (See, Trans., p. 52.) ins-
20  tead , he is sanctioned because "he does not have viable resi-
21  dential plans in the county of legal residence." (Trans. p.54.)

22          4.   The BOARD stated, Petitioner "does not have
23  acceptable employment plans." (Id. @ p.54.)   However, the BOARD
24  sees hundred of prisoners who will be deported to their home
25  countries, if ever released, and they also know, in many cases
26  it is virtually impossible for a person to generate viable
27  employment plans once he is deported. In case of Mexico, many
28  aliens enter the United States because of minimum employment

5 ( m )

1    in the first place. But Petitioner <u>does</u> have employment plans;

2    and so informed the Panel. He is a Born-again Christian, and a

3    trained minister of his faith. (Trans. p. 32.) Petitioner is

4    also an experienced welder, and so informed the BOARD. (Trans.

5    p.42.)  At any rate, these conditions will never change at this

6    time in Petitioner's life. He is now a graying middle-aged man;

7    and will in all likelyhood spend the rest of his life in prison

8    without parole (LWOP), for all the reasons aforementioned.

9

10      <u>WHEREFORE</u>: For the foregoing reasons, Petitioner respect-

11   fully requests that this Honorable Court issue an Order To Show

12   Cause and upon full hearing direct the B.P.H. to hold fair,

13   just and impartial hearings, and to grant Petitioner a fair and

14   impartial Panel of B.P.H. Commissioners; set a reasonable release

15   date, and release him on parole. He has honorably served his

16   time, and it is now time for the B.P.H. to honor their half of

17   the bargain. The Court is petitioned to grant the Writ of

18   Habeas Corpus. In the alternative, that the Court use its own

19   discretion as the Court of proper jurisdiction and Order the

20   immediate release of Petitioner this, in fact, "is the very

21   essence of habeas relief". Habeas Corpus lies to enforce the

22   right of personal liberty; the Superior "Court has the power to

23   release him." <u>Phifer v. Warden U.S. Penitentiary, Terre Haute</u>

24   <u>Indiana</u>, 53 F.3d 859 (7th. Cir. 1995.) Petitioner has estab-

25   at the least, a <u>Prima Facie</u>, case for relief, and evidentiary

26   hearings should be held.

27   ////////////////////

28   ////////////////////

1          THE PROOF IS IRREFUTABLE EVEN TO THE COURT, NOW, THAT

2          THE BOARD OF PAROLE HEARINGS IS ENGAGED IN A POLICY OF

3          NO PAROLE, AS MUCH AS POSSIBLE. EITHER THEIR ACTIONS

4          ARE PURPOSEFULLY UNLAWFUL AND MALICIOUS, OR THE BOARD

5          COMMISSIONERS ARE WOEFULLY INEPT IN THEIR KNOWLEDGE OF

6          THE LAW AND DUE PROCESS, AND THEREFORE ARE IN DIRE

7          NEED OF CORRECTIVE SCHOOLING, SUPERVISION AND OVER-

8          SIGHT IN THE PERFORMANCE OF THEIR CRITICALLY IMPORTANT

9          DUTIES AS BOARD COMMISSIONERS, IN ORDER TO STAY WITH-

10          IN THE LAWS OF STATE AND NATION, AND THE PARAMETERS

11          OF THE XIVTH. AMENDMENT TO THE UNITED STATES CONSTITUTION.

12

13 I.      As will be seen in the following quotations from the cited

14 case, many jurists are now convinced beyond any doubt that something is

15 seriously wrong with the manner in which the B.P.H. conducts its duty

16 to the citizens of the State of California under the auspices of

17 the Governor who selects them for this work, and the Executive Branch

18 of State Government of which they are members.

19      A.    Petitioner is personally of the opinion that the actions

20 of the B.P.H. are far from innocently ignorrant and arbitrary, but

21 rather, that they are planned, purposeful covert actions designed to

22 cripple and subvert the constitutions of State and Nation by insuring

23 life term prisoners in the C.D.C.R. are never paroled. Additionally,

24 many courts are sympathetic with that objective and consciously coop-

25 erate with the Executive Branch to water down the Petition For Writ

26 of Habeas Corpus so that it becomes a useless instrument in these mat-

27 ters. Some Jurists give the B.P.H. the benefit of the doubt, and the

28 following case Holding is a perfect example, to wit:

1   Please see, In re Jamieson Case No: 71194, Superior Court County of
2   Santa Clara (Aug 30, 2007), pp. 26-

### CONCLUSION

4       ------"The conclusive nature of the proof in this case,
5   and the suggestion of institutional bias do not pre-
6   clude formulation of a remedy which will guarantee
    adequate restrictions on, and guidance for, the Board's
7   exercise of discretion in making parole suitability
8   determinations. The Board can be made to lawfully perform its du±
9   ties if given explicit instructions.

10      As noted supra, a reason the proof in this case irrefutably
    establishes constitutional violations is because the Board does
11  not, in actual fact, operating within the limiting construction
12  of the regulations. The Board's expansive interpretation ~~allows~~
    allows it to operate without any true standards. Although numerous
13  rulings of both state and federal courts of appeal have invalidated
14  the Board's application of the §2402(c) criteria to particular
15  facts, the Board does not take guidance from these binding prece-
    dents and ignores them for all other purposes. In the most recent
16  of these cases, In re Roderick, (2007) ___ Cal. App. 4th ___ .

17  (A 113370) the First District held four of five §2402 factors
18  "found" by the Board to be unsupported by any evidence. At footnote
19  14 the court took the time to criticize the Board for its repeated
    use of a "stock phrase" "generically across the state." The Court
20  also clarified that "at minimum," the Board is responsible for ar-
21  ticulating the grounds for its findings and for citing to evidence
22  supporting these grounds.

23      There is nothing in the evidence presented that would allow
    any conclusion but that, without intervention of the Courts, the
24  Board will ignore the lessons of these rulings in the future and
25  continue to employ its formalaic approach of citing a criteria for
26  §2402(c)(1), repeating the facts of the crime, but never demon-
    strating a logical connection between the two. This is the core
27  problem with the Board's methodology -- they provide no explanation
28  or rationale for the findings regarding the crime itself. This

1  "practise results in violence to the requirements of due process
2  and individualized consideration which are paramount to the appro-
   priate exercise of its broad discretion.
3      The only solution is one that compels the Board to identify
4  the logical connection between the facts upon which it relies and
5  the specific criteria found to apply in the individual case. For
   example, the Board often finds that an inmate's motive is "triv-
6  ial" without ever suggesting why, on these facts, that motive is
7  not just as trivial as the motive behind any other murder. What
8  motive is not trivial? By any definition, "trivial" is a word of
   comparison and only has meaning when there can be examples that
9  are not "trivial."
10     Similarly, although the Sixth District made it plain four years
11 ago that "all [] murders by definition involve some callousness,"
   (In re Smith (2003) 114 Cal.App.4th 343, 345,) the Board has con-
12 tinued to deny countless paroles labeling the crime "callous" with-
13 out ever suggesting what crime would not qualify as "callous" and
14 without consistently explaining why the individual case before it
   demonstrates "exceptional" callousness.
15     Respondent has consistently refused to suggest what possible
16 instances of murder would not fit the Board's amorphous applica-
17 tion of the §2402 criteria. Citing Dannenberg, Respondent insists
   such comparative analysis is unnecessary. Respondent fundamentally
18 misunderstands the Dannenberg holding.
19     The PC § 3041(b) exception to the rule can only be invoked
20 when the "gravity of the current convicted offense or offenses,
21 is such that the consideration of the public safety requires a
   more lengthy period of incarceration for this individual." The
22 word "gravity" is a directive for comparison just as "more lengthy"
23 indicates a deviation from the norm. While Dannenberg held there
24 does not need to be intra case comparison for the purposes of term
   uniformity or proportionality, there necessarily has to be some
25 sort of comparison for the purposes of adhering to the legislative
26 mandate that parole is available. This is implicit in §2402 be-
27 cause the qualifier "especially",in"especially heinous or atrocious
   or cruel," requires that some form of comparison be made. While
28 the original drafters of § 2402 seemed to have recognized this fact,

5(q)

1

2

"the on-going conduct of the Board has completely ignored it,
and this is the essence of the due process violations Petition-
ers have asserted.

3

4

5

6

7

8

9

10

11

12

13

14

As noted in his dissent in the recent case of In re Roder-
ick, supra, Justice Sepulveda would have deferred to the Board's
'exercise' of discretion because "Board members have both train-
ing and vast experience in this field. They conduct literally
thousands of parole suitability hearings each year. The Board
therefore has the opportunity to evaluate the egrigiousness of
the facts of a great number of commitment offenses. ... The
Board's training and experience in evaluating these circumstan-
ces far exceeds that of most, if not all, judges," The evidence
in this case, however, suggests a flaw in granting such defer-
ence. Since the Board continues to place every murder in the
category of offenses "tending to show unsuitability," something
is certainly wrong. Since the Board's vast experience is unde-
niable, the problem must be in the Board's training and under-
standing of the distinguishable features of guidelines and cri-
teria. Although Justice Sepulveda presumes the Board members

15

16

17

receive substantive training, there is no evidence before this
Court to suggest that it does, and substantial circumstantial
evidence that it does not.

18

19

20

21

22

23

24

25

26

27

28

In the vast numbers of Santa Clara County cases reviewed by
this Court, the Board's formulaic decisions regarding the com-
mitment offense do not contain any explanation or thoughtful
reasoning. Instead, the Board's conclusionary invocation of
words from §2402(c) (1) is linked to a repetition of the facts
from the Board report by the stock phrase; "These conclusions
are drawn freom the statement of facts wherein ..." Thereafter
the inmate files a habeas corpus petition and Respondent, after
requesting an extension of time, files a boilerplate reply as-
serting the Board's power is "great" and "almost unlimited" and
and thus any "modicum" of evidence suffices. Respondent does
not cite or distinguish the expanding body of case law that is
often directly on point as to specific findings made. Thereaf-
ter, if the writ is granted, the Board is directed to conduct
a new hearing "in compliance with due process" and that order

5(r)

1   "is appealed by Respondent. On appeal the order is

2   usually upheld with modifications and in the end,

3   after countless hours of attorney and Judicial time,

  the Board conducts a new two hour hearing at which their dis-

4   cretion and violate due process in some different way.

5     This system is malfunctioning and must be repaired. The

  solution must begin with the sourse of the problem. The Board

6   must make efforts to comply with due process in the first ins-

7   tance. The case law published over the last five years provides

8   ample and sufficient guidelines and must be followed. Although

  the Board methods suggest it believes this to be optional, it

9   is not...."

10               REMEDY

11     "Thus, it is the Order of this Court that the Board develop,

12   submit for approval, and then institute a training policy for

13   its members based on the current and expanding body of published

  state, and federal case law reviewing parole suitability deci-

14   sions, and specifically the application of §2402 criteria. In

15   addition to developing guidelines and further criteria for the

16   substantive application of §2402 the Board must develop rules,

  policies and procedures to ensure that the substantive guide-

17   lines are followed.

18     This Court finds its authority to impose this remedy to

19   flow from the fundamental principles of judicial review an-

  nounced over two centuries ago in <u>Madison v. Marbury</u>, (1803)

20   5 U.S. (1 Cranch) 137. Citing that landmark case, the Califor-

21   nia Supreme Court has recognized "Under time-honored princi-

22   ples of the common law, these incidents of the parole applica-

  nt's right to 'due consideration' cannot exist in any practi-

23   cal sence unless there also exists a remedy against abrogation."

24   (<u>In re Sturm</u>, 11 Cal. 3d 258, 268.)

25     In <u>Sturm</u>, the Court directed that the Board modify its

  rules and procedures so that thereafter "The Authority will

26   be required [,] commencing with the finality of this Opinion

27   to support all its denials of parole with a written, definitive

28   statement of its reasons therefor and to communicate such

1    "(1) such a broadly all encompassing and universal application)
2    is that they have unwittingly invalidated the basis of the
3    California Supreme Court's holding in Dannenberg. The reason
4    the four Justice majority in Dannenberg upheld the Board's
5    standard operating procedures in the face of the Court of Appeal
6    and dissent position is because the Board must apply detailed
7    standards when evaluating whether an individual inmate is un-
8    suitable for parole on public safety grounds " (Dannenberg, at
9    p. 1096, footnote 16. See also page 1080: "the regulations do
10   set detailed standards and criteria for determining whether a
11   murderer with an indeterminate life sentence is suitable for
12   parole.") However, Petitioners in these cases have proven that
13   there are no "detailed standards" at all. Instead the Board has
14   systematically reduced the "detailed standards" to empty words.
15   The remedy this Court orders, that there be truly be "detailed
16   -standards," requires the promulgation of further rules and
17   procedures to constrain and guide the Board's power's.
18   This remedy differs in specifics, but not in kind, from what
19   courts have previously imposed and have always had the power
20   to impose.

          The Board must fashion a training program and further rules,
     standards and regulations based on the opinions and decisions
     of the state and federal court cases which provide a limiting
     construction to the criteria which are applied.[8] The
     Board must also make provisions for the continuing
     education of                              its comm-
     issioners as new case law is published and becomes
     binding authority. This Court will not at this point,
     outline the requirements and lessons to be taken
     from the above cases. It is the Board's duty, in
     the first instance to undertake this task. The train-
     ing program, and associated rules and regulations,

--------------------------------
[8] While the showing and analysis in this case was limited to §2402(c)(1), the
conclusions that the evidence compelled, that the Board has been carelessly
distorting and misapplying the regulations, is not so limited. Accordingly,
the training program that is necessary for the Board can not reasonable be
limited to just § 2402(c)(1). Thus, to the extent case law recognizes, cla-
rifies and establishes remedies for other due process violations they must
also be incorporated into necessary rules and training the Board is required
to abide by.

1  "statement to the inmate concerned." (Sturm, at 273.)"

2      Similarly, in the case of Minnis, supra, the California

3  Supreme Court held the Board's policy of categorically denying
   parole to drug dealers was illegal. Based on its analysis the

4  Court there was clearly prepared to order that Board to modify

5  its rules and procedures however such was unnecessary because

6  the Board "voluntarily rescinded" the illegal policy. While
   the remedy in this case is of greater scope than that necessary

7  in either Sturm or Minnis, supra, so too has been the showing

8  of a systematic abuse of discretion and distortion of process.

9      The most recent case to address the Court's roles and
   duties in overseeing the parole suitability process has been

10 in In re Rosenkrantz, supra, 29 Cal.4th 616. In that case the

11 court explained that judicial review of a Governor's parole

12 determination comports with, and indeed further, separation of
   Powers principles because the courts are not exercising "com-

13 plete power" over the Executive branch and do not "defeat or

14 materially impair" the appropriate exercise or scope or execu-

15 tive duties. (Rosenkrantz, at p. 662.) Citing Sturm, supra,
   the Court reaffirmed that a life term inmate's "due process

16 rights rights cannot exist in any practical sence without a

17 remedy against its abrogation." (Rosenkrantz, at p. 664.)

18     The Rosenkrantz court also put forth what it believed was
   an extreme example but which, unfortunately, has been shown to

19 exist in this case. The court stated: "In the present context,

20 for example, judicial review could prevent a Governor from
   usurping the legislative power, in the event a Governor failed

21 to observe the constitutionally specified limitations upon pa-

22 role review authority imposed by the voters and the Legislature."

23 This is exactly what the evidence in this case has proven. As
   As noted above the Board has abrogated to itself absolute au-

24 thority, despite legislative limitations and presumptions,

25 through the mechanism of a vague and all inclusive, and thus

26 truly meaningless, application of standards, The remedy this
   Court is imposing is narrowly tailored to redress this consti-

27 tutional violation.

28     The consequence of the Board's actions (of giving § 2402(c)

"shall be served and submitted to this Court, in writing, with-
in 90 days. Counsel for Petitioners, and any other interested
parties, may submit briefs or comments within 30 days thereaf-
ter. After receipt and review of the materials this Court will
After receipt and review of the materials this Court will fina-
lize the training program, and associated rules, and the Peti-
tioners in these cases shall receive a new hearing before a
Board that does not operate by the evidence here presented."

ORDER

"For the above reasons the habeas corpus petition is granted and
it is hereby ordered that Petitioner be provided a new hearing which shall
comply with due process as outlined above. Respondent shall provide weekly
updates to this Court on the progress of its development of the new rules
and regulations outlined above."

DATED:   30 Aug, 2007

_____
LINDA R. CONDRON
JUDGE OF THE SUPERIOR COURT

4.    Petitioner's Layman Assistant, would like to take this opportu-
nity to apologize to this Court, because he wrote three major and rather
lengthy quotes in their entirety, instead of citing the documents and pre-
senting his own analysis. However, in the past, from the B.P.H. Chambers,
to many of the Courts he has litigated in, the words "conclusory", "no evid-
ence in the record", "vague"; et cetera, crop up with regularity, and per-
haps with some correctness, as incarcerated Petitioner's are often handi-
capped in the institutions and find it difficult to access WESTLAW, and other
helpful research engines. But these three Jurists quoted herein, have it just
right and mirror Petitioner's sentiments exactly. It is no easy task to fight
the State with all its power and resources such as the Electronic media, etc.

Just so, included as Exhibit 𝟧  , there is a Flyer issued by the Sacra-
mento Bee, where Senior Assistant Attorney General Julie Garland, is complain-
ing that judges are violating the Separation of Powers Act, and are over-
ruling the Governor too often, (about 1% of the Lifer population), are actu-
ally getting out! This is an ironic statement, because this Writer, has been

5(v)

1  sounding the alarm on the Separation of Powers issue for years. It

2  is the Governor and the Executive Branch: (inclusive, the B.P.H.),

3  that have usurped the power of the Judicial and Legislative  Branches

4  all these years. In fact, there exista a mini-government inside the

5  the State government of the State of California, which has granted

6  itself immunity, and does not hesitate to flount the Rules, Guidelines

7  and Statutes of the State and Nation regularly, without fear of repri-

8  sal. This development verges on fascism and tyranny. It is an alarm-

9  ing situation, and that must be stopped.

10                         PRAYER FOR RELIEF

11      WHEREFORE: Petitioner has presented, he feels, a prima facie

12  case for relief, in that he is illegally incarcerated by B. Curry,

13  Warden, and the Board of Parole Hearings Commissioners, et al, at,

14  Correctional Training Facility, Soledad, CA. His Fourteenth and Fifth

15  Amendment United States Constitution rights to Due Process have been

16  abrogated because a pro forma, subrosa hearing does not satisfy that

17  requirement. He has become a 'pawn' in the political 'game' of the

18  "no-parole-policy". If any person is suitable for parole, it is the

19  Petitioner in the case instant., for which he has already served 19

20  years in-house. If there is a true parole policy in this State, then

21  this man should be suitable for parole. Petitioner prays, therefore,

22  that this Court revisit the Holding in the case of In re Powell, supra,

23  Order Evidentiary Hearings to examine the particularities of this

24  case specifically, and finally issue the Petition For Writ of Habeas

25  Corpus, and take curative action to clean up the corruption that is

26  now endemic in law enforcement, corrections, and parole in this State.

    DATED: March 24 , 2008        _Benjamin Hernandez_

27                                BENJAMIN HERNANDEZ, Petitioner
                                  In Pro per, In forma Pauperis

28

                              5(w)

Claim Three: _____

_____

Supporting Facts: _____

_____

_____

_____

_____

If any of these grounds was not previously presented to any other court, state briefly which grounds were not presented and why:

THIS PETITION DEALS WITH THE B.P.H.'S REFUSDAL TO FIND FOR PAROLE

SUITABILITY; AND THE REASONS WHY. _____

_____

_____

List, by name and citation only, any cases that you think are close factually to yours so that they are an example of the error you believe occurred in your case.  Do not discuss the holding or reasoning of these cases:

In re Powell, (1988) 45 Cal.3d.894; 248 Cal.Rptr. 431(Cal. 1988);

Superintendant v. Hill, 472 U.S. 455 (1985). Hamdi v. Rumsfeld, 124

2633, 2650, 2651 (2004); McQuillon v. Duncan, 306 F.3d.@ 902 .

Do you have an attorney for this petition?   Yes ____   No _X_
If you do, give the name and address of your attorney:

Petitioner is helped by Joseph P. Gutierrez, D-02765, Z-138L, CTF II

(C), P.O. Box 689, Soledad, CA 93960-0689, Layman Assistant, Pro Bono.
WHEREFORE, petitioner prays that the court grant petitioner
relief to which s/he may be entitled in this proceeding.  I verify
under penalty of perjury that the foregoing is true and correct.

Executed on _March 24, 2008_          _Alexander Benjamin_
                 Date                  Signature of Petitioner

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT   A**

**EXHIBIT A**

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of:               )      CDC Number E-51808
                          )      INMATE
Benjamin Hernandez        )      COPY
                          )
_____)

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

September 28, 2005

12:00 P.M.

PANEL PRESENT:

TRACEY ST. JULIEN, PRESIDING COMMISSIONER
ROLANDO MEJIA, DEPUTY COMMSISSIONER

OTHERS PRESENT:

BENJAMIN HERNANDEZ, INMATE
CANDACE CHRISTENSEN, ATTORNEY FOR INMATE
LAWRENCE MORRISON, DEPUTY DISTRICT ATTORNEY
ANNA MASSUNG, SPANISH INTERPRETER

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____  No      See Review of Hearing
_____  Yes     Transcript Memorandum

**Sue Gerdes, Peters Shorthand Reporting**

ii

## INDEX

                                                              PAGE

Proceedings........................................... 1

Case Factors.......................................... 11

Pre-Commitment Factors................................ 13

Post-Commitment Factors............................... 18

Parole Plans.......................................... 40

Closing Statements.................................... 43

Recess................................................ 49

Decision.............................................. 50

Adjournment........................................... 58

Transcriber Certification............................. 59

1

| 1 | **P R O C E E D I N G S** |
|---|---|
| 2 | **PRESIDING COMMISSIONER ST. JULIEN:**  Okay. |
| 3 | Thank you.  This is a Subsequent Parole Hearing |
| 4 | for Benjamin Hernandez.  The time is 12 noon. |
| 5 | Mr. Hernandez's CDC number is E-51808.  Today's |
| 6 | date is September 28th, 2005 and we are at the |
| 7 | Correctional Training Facility in Soledad.  The |
| 8 | inmate was received on April 13th, 1990 with a |
| 9 | life term starting October 25, 1992.  Violation |
| 10 | of count one murder second with the use of a |
| 11 | deadly weapon, Penal Code sections 187 and |
| 12 | 12022B case number A975792, in the county of Los |
| 13 | Angeles.  The inmate received a term of 15 years |
| 14 | to life, six years consecutive sentence. |
| 15 | Minimum eligible parole date of October 25, |
| 16 | 2002.  Is that correct? |
| 17 | **INMATE HERNANDEZ THROUGH INTERPRETER:** Yes |
| 18 | **PRESIDING COMMISSIONER ST. JULIEN:**  This |
| 19 | hearing is being tape recorded so for the |
| 20 | purposed of voice identification, we are going |
| 21 | to go around the room and introduce ourselves. |
| 22 | We will say our first and last name, spell our |
| 23 | last name and then when it's your turn Sir if |
| 24 | you'd also state your CDC number.  My name is |
| 25 | Tracey St. Julien S-T-J-U-L-I-E-N, Commissioner |
| 26 | Board of Parole Hearings. |
| 27 | **DEPUTY COMMISSIONER MEJIA:**  Rolando Mejia |

2

1    M-E-J-I-A, Deputy Commissioner.

2          **DISTRICT ATTORNEY:**  Lawrence Morrison M-

3    O-R-R-I-S-O-N, Los Angeles District Attorney.

4          **ATTORNEY CHRISTENSEN:**  Candace

5    Christensen C-H-R-I-S-T-E-N-S-E-N, Attorney for

6    Mr. Hernandez.

7          **INMATE HERNANDEZ:**  Benjamin Hernandez, E-

8    51808.

9          **INMATE HERNANDEZ THROUGH INTERPRETER:**

10   Benjamin Hernandez, E-51808

11         **PRESIDING COMMISSIONER ST. JULIEN:**  And

12   then your name also Ma'am.

13         **INTERPRETER:**  Anna Massung M-A-S-S-U-N-G,

14   Spanish Interpreter of California Certified.

15         **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

16   Ms. Massung, I am going to give you an oath

17   before we start.  Okay.  You can raise your

18   right hand.  Do you solemnly swear to translate

19   Spanish to English and English to Spanish the

20   best to your knowledge and ability?

21         **INTERPRETER MASSUNG:**  I do.

22         **PRESIDING COMMISSIONER ST. JULIEN:**  Okay,

23   thank you.  Mr. Hernandez, that white sheet of

24   paper before you, it's a statement that talks

25   about your ADA rights and can you read English?

26         **INMATE HERNANDEZ THROUGH INTERPRETER:**

27   Yes.

3

1      **PRESIDING COMMISSIONER ST. JULIEN:** Can

2  you read that well enough to read that aloud to

3  us?

4      **INMATE HERNANDEZ:** Yes.  The American with

5      Disabilities Act, ADA, is a law to help

6      people with disabilities.  Disabilities are

7      problems that make it harder for some

8      people to see, hear, breath, talk, walk,

9      learn, think, work or take care of

10     themselves than it is for others.  No one

11     can be kept out of public places or

12     activities because of a disability.  If you

13     have a disability you have the right to ask

14     for help to get ready for your court or

15     parole hearing.  To get to the hearing,

16     talk, read forms and papers and understand

17     the hearing process.  The BPT will look at

18     what you ask for to make sure that you have

19     a disability that is covered by the ADA and

20     that you have asked for the kind of help.

21     If you do not get help or if you don't

22     think that you got the kind of help that

23     you need, you can also ask for a BPT 1074

24     Grievance form.  You can also get help to

25     fill it out.  Thank you.

26     **PRESIDING COMMISSIONER ST. JULIEN:** Okay.

27  That was very good.  Can you just tell me what

4

```
 1   that means in your own words?

 2        INMATE HERNANDEZ THROUGH INTERPRETER:

 3   Yes, it's about the disabled.  People who can

 4   speak, breath, can't learn, think, or work.

 5   People like us.  And they offer help.  There

 6   words of help.

 7        PRESIDING COMMISSIONER ST. JULIEN: Okay.

 8   And I note that on December 15$^{th}$, 2004 you

 9   signed a BPT form 1073 indicating that you did

10   not have any disabilities.  However, you did

11   need the services of a Spanish Interpreter.  Is

12   that still correct?

13        INMATE  HERNANDEZ THROUGH INTERPRETER:  I

14   didn't understand that very well.

15        PRESIDING COMMISSIONER ST. JULIEN:  Do

16   you have the form Ms. Christensen?

17        ATTORNEY CHRISTENSEN:  Yes I do.

18        PRESIDING COMMISSIONER ST. JULIEN:  Your

19   attorney will show you the form I am talking

20   about.

21        ATTORNEY CHRISTENSEN:  Right here.  He

22   signed that form back in April and he checked

23   the box.  I do not have a disability.  Remember

24   that.

25        PRESIDING COMMISSIONER ST. JULIEN:  Okay.

26   Do you have -- is that still accurate that you

27   don't have any disabilities?
```

5

1          **INMATE HERNANDEZ THROUGH INTERPRETER:** So
2  far I haven't needed any kind of help.
3          **PRESIDING COMMISSIONER ST. JULIEN:** So
4  did you have any trouble walking in the room.
5  Walking up and down stairs?
6          **INMATE HERNANDEZ:** No.
7          **PRESIDING COMMISSIONER ST. JULIEN:** Can
8  you see everybody around the room okay and you
9  read the statement? What about hearing?
10          **INMATE HERNANDEZ:** (indiscernible)
11          **PRESIDING COMMISSIONER ST. JULIEN:** I
12  note that you are still working on your GED?
13  Is that correct?
14          **INMATE HERNANDEZ THROUGH INTERPRETER:**
15  I'm not studying right now.
16          **PRESIDING COMMISSIONER ST. JULIEN:** Do
17  you have any learning difficulties?
18          **INMATE HERNANDEZTHROUGH INTERPRETER:** Just
19  with that.
20          **PRESIDING COMMISSIONER ST. JULIEN:** Just
21  with the test or?
22          **INMATE HERNANDEZ THROUGH INTERPRETER:**
23  With learning.
24          **PRESIDING COMMISSIONER ST. JULIEN:** But
25  you were able to read that notice and
26  comprehend. So your not --
27          **ATTORNEY CHRISTENSEN:** He believes that

6

1    he has a learning disability and that he has

2    tried several at least one time to pass the GED

3    and has not.  It has been determined that he's

4    gone about as far as he can educationally.

5         PRESIDING COMMISSIONER ST. JULIEN:  You

6    know a lot of people take the GED more than

7    once.

8         ATTORNEY CHRISTENSEN:  Of course.

9         PRESIDING COMMISSIONER ST. JULIEN:  Do

10   know the CMS and EOP programs are?

11        INMATE HERNANDEZ:  No.

12        PRESIDING COMMISSIONER ST. JULIEN:  Okay,

13   they are the mental health services programs

14   that the department provides.  If you need

15   psychological counseling for depression or

16   other mental health issues.  Have you ever been

17   a part of those programs?

18        INMATE HERNANDEZ THROUGH INTERPRETER:

19   No, because I don't need them.

20        PRESIDING COMMISSIONER ST. JULIEN:  Have

21   you ever taken any psychotropic medications?

22        INMATE HERNANDEZ:  No.

23        PRESIDING COMMISSIONER ST. JULIEN:  Are

24   you on any medications now?  For pain or

25   anything?

26        INMATE HERNANDEZ THROUGH INTERPRETER:

27   When I have a flu I take some medicine at

7

1    times.

2        **PRESIDING COMMISSIONER ST. JULIEN:**  So do

3    you think that any of the medications that you

4    have taken would cause you any side affects?

5    So that you can't participate today?

6        **INMATE HERNANDEZ THROUGH INTERPRETER:**

7    No, I'm fine.

8        **PRESIDING COMMISSIONER ST. JULIEN:**  And

9    Ms. Christensen are you satisfied that your

10   clients ADA rights have been met?

11       **ATTORNEY CHRISTENSEN:**  Yes I am.

12       **PRESIDING COMMISSIONER ST. JULIEN:**  I am

13   going to give you an outline of the hearing

14   procedure today.  The hearing is being

15   conducted pursuant to Penal Code sections 3041

16   and 3042 and the rules and regulations of the

17   Board of Parole Hearings governing parole of

18   consideration hearings for life inmates.  The

19   purpose of the hearing today is to consider

20   your suitability for parole.  We will reach a

21   decision today and inform you whether or not we

22   find you suitable for parole and the reasons

23   for that decision.  If you are found suitable

24   the length of your confinement will be

25   explained to you.  The hearing will be

26   conducted in two parts.  First, I will discuss

27   with you the number and nature of the crimes

8

1    that you were committed for, your prior

2    criminal and social history, your parole plans,

3    and any support or opposition letters.  The

4    Commissioner Mejia will discuss with you your

5    programming since your commitment.  Your

6    counselors report and psychological evaluation.

7    We have had the opportunity to review your

8    central file and prior hearing transcripts.

9    You will also be given an opportunity to

10   correct or clarify the record.  When that is

11   done, the district attorney and your attorney

12   will be give the opportunity to ask you

13   questions.  And the district attorney's going

14   to ask his questions to us at the panel and

15   then you also answer to us.  Before we recess

16   the district attorney, your attorney, and you

17   will be given the opportunity to make a final

18   statement regarding your parole suitability.

19   Your statement should be limited as to why you

20   feel you are suitable for parole.  We will then

21   recess, clear the room, deliberate.  When we

22   complete our deliberations we'll resume the

23   hearing and announce the decision.  The

24   California Code of Regulations states that

25   regardless of time served, a life inmate be

26   found unsuitable for and denied parole if in

27   the judgment of the panel, the inmate will pose

9

1   an unreasonable risk to society if released

2   from prison.  And do you understand that Sir?

3          **INMATE HERNANDEZ THROUGH INTERPRETER:**

4   Yes.

5          **PRESIDING COMMISSIONER ST. JULIEN:**  You

6   also have certain rights and those rights

7   include the right to a timely notice of this

8   hearing and the right to present relevant

9   documents.  Ms. Christensen have you clients

10  rights been met in that regard?

11         **ATTORNEY CHRISTENSEN:**  Yes they have.

12         **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

13  You also have the right to be heard by an

14  impartial panel.  Do you have any objections to

15  today's panel?

16         **INMATE HERNANDEZ:**  No.

17         **PRESIDING COMMISSIONER ST. JULIEN:**  Ms.

18  Christensen?

19         **ATTORNEY CHRISTENSEN:**  I do not.

20         **PRESIDING COMMISSIONER ST. JULIEN:**  You

21  will receive a copy of the decision today.  The

22  decision is subject to review by the decision

23  review unit in the entire board meeting as a

24  whole.  It will become effective within 120

25  days.  It is also subject to review by the

26  governor.  A copy of the decision and the

27  hearing transcripts will be sent to you.  The

10

1  board no longer has an appeals process, so if

2  you have any objections to the hearing today

3  you need to file those directly with the court.

4  You are not required to admit your offense or

5  discuss your offense if you do not wish to do

6  so.  However, the board does accept as true the

7  findings of the court.  You're invited to

8  discuss the facts and circumstances of the

9  offense if you wish.  The board will review and

10  consider any prior statements that you have

11  made regarding the offense in determining your

12  suitability for parole.  Commissioner Mejia, is

13  there confidential information?

14      **DEPUTY COMMISSIONER MEJIA:**  No there is

15  no confidential information.

16      **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

17  Earlier I passed a check list marked exhibit

18  one to your attorney and the district attorney.

19  And I received that back so I will assume that

20  the documents are in order.

21      **ATTORNEY CHRISTENSEN:**  That's correct.

22      **DISTRICT ATTORNEY MORRISON:**  That's

23  correct.

24      **PRESIDING COMMISSIONER ST. JULIEN:** Thank

25  you.  Ms. Christensen, do you have any

26  additional documents?

27      **ATTORNEY CHRISTENSEN:**  No I don't.

11

1      **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

2    Do you have any preliminary objections?

3      **ATTORNEY CHRISTENSEN:**  None.

4      **PRESIDING COMMISSIONER ST. JULIEN:**  And

5    will Mr. Hernandez be speaking with us today?

6      **ATTORNEY CHRISTENSEN:**  Yes he will.

7      **PRESIDING COMMISSIONER ST. JULIEN:**  I

8    need to give you an oath Sir.  Do you solemnly

9    swear or affirm that the testimony you give at

10   this hearing will be the truth, the whole truth

11   and nothing but the truth?

12     **INMATE HERNANDEZ THROUGH INTERPRETER:**

13   Yes.

14     **PRESIDING COMMISSIONER ST. JULIEN:**  I'm

15   going to read the summary of the crime as it

16   appears in the August 2001 board report.  The

17   report was prepared by correctional counselor,

18   last name D-E-R-R and approved by the

19   classification and parole representative, last

20   name E-F-S-E-A-F-F.  And it states that on

21   January 14th, 1989 the victim defended and

22   others including the defendant's brother,

23   Rosendo Hernandez R-O-C-E-N-D-O had all been

24   drinking beer on east fortieth place.

25   Witnesses indicated the defendant's brother

26   started arguing with the victim, accusing him

27   of not paying for some donuts he had purchased

12

1    for the victim.  The defendant who in this
2    instance is the inmate.  The inmate's brother
3    and the victim then started fighting using
4    their fists.  The inmate went to the aid of his
5    brother and pulled out a folding knife and
6    stabbed the victim in the stomach.  Apparently
7    the victim kept fighting and they both fell to
8    the ground.  Witnesses indicated they believe
9    the inmate had also stabbed his brother by
10   accident because when they saw the fighting
11   stop, the inmate's brother was bleeding and was
12   grabbing his stomach.  The inmate and his
13   brother then left the area running and some of
14   the witnesses went to notify the police and
15   others took the victim to the hospital.  The
16   victim expired from the wounds suffered at the
17   hands of the defendant.  Is that correct Sir as
18   far as your recollection?
19        **INMATE HERNANDEZ THROUGH INTERPRETER:**
20   Can I say something?
21        **PRESIDING COMMISSIONER ST. JULIEN:**  Yes.
22        **INMATE HERNANDEZ THROUGH INTERPRETER:**
23   The fight began because of donuts.
24        **PRESIDING COMMISSIONER ST. JULIEN:**  It
25   did?  It did begin because of donuts?
26        **INMATE HERNANDEZ THROUGH INTERPRETER:**
27   That was just an excuse.  Because my brother,

13

1    Rocendo, He was beaten and I was beaten too and

2    he had problems with the people that did it.

3    They didn't know that I was Rocendo's brother.

4    Which means the donuts were just an excuse.

5        PRESIDING COMMISSIONER ST. JULIEN:   Were

6    an excuse for the fight?

7        INMATE HERNANDEZ THROUGH INTERPRETER:   It

8    was a vengeance because of a problem that my

9    brother Rocendo had with some of the people.

10       PRESIDING COMMISSIONER ST. JULIEN:   I

11   think I read what you are refereeing to and is

12   that the problem that involved the victim

13   bringing you and other members of your family

14   from Mexico to the US for money?

15       INMATE HERNANDEZ THROUGH INTERPRETER:

16   No.

17       PRESIDING COMMISSIONER ST. JULIEN:

18   That's not correct?

19       INMATE HERNANDEZ:   No.

20       PRESIDING COMMISSIONER ST. JULIEN: Then

21   what was the problem stemming from?

22       INMATE HERNANDEZ THROUGH INTERPRETER:

23   The problems stem from years way back.   Because

24   my brother had a problem back in Mexico.   He

25   found these people in this country.   And that

26   was why that problem happened.

27       PRESIDING COMMISSIONER ST. JULIEN:   You

14

1    are going to have to explain to me.  What was

2    the original problem between your brother and

3    the victim.

4           **INMATE HERNANDEZ THROUGH INTERPRETER:**  It

5    was not the donuts, it was for vengeance.

6           **PRESIDING COMMISSIONER ST. JULIEN:**  Okay,

7    vengeance?

8           **INMATE HERNANDEZ THROUGH INTERPRETER:**

9    Because Rocendo fought with a friend of the

10   those people back in Mexico.

11          **PRESIDING COMMISSIONER ST. JULIEN:**  What

12   was the fight about?

13          **INMATE HERNANDEZ THROUGH INTERPRETER:**

14   I don't know.

15          **PRESIDING COMMISSIONER ST. JULIEN:**

16   Okay, so you fought with the victim and you

17   didn't know what you were fighting about?

18          **INMATE HERNANDEZ THROUGH INTERPRETER:**

19   No.

20          **PRESIDING COMMISSIONER ST. JULIEN:**  Does

21   that make any sense to you?

22          **INMATE HERNANDEZ THROUGH INTERPRETER:**

23   Yes, because I did not know those people.  And

24   those people did not know me either.  They

25   showed up there.  We were at that place and

26   they began fighting verbally and then fighting

27   physically.  And then they started hitting him.

15

1    And I wanted to separate them so I went between

2    them and I was also beaten.  And as I was down,

3    I had a knife in my pocket.  I opened it.  I

4    didn't want to injure anyone I just wanted to

5    scare them.  But he fell on top of me and I

6    stabbed him several times.  That's what

7    happened.

8         **PRESIDING COMMISSIONER ST. JULIEN:**  So

9    when you say he fell on top of you and Benjamin

10   you stabbed him several times.

11        **INMATE HERNANDEZ THROUGH INTERPRETER:**  He

12   didn't fall on top of me I was thrown to the

13   ground.  And as I stood up, that is when I

14   stabbed him several times because he was, they

15   were beating on Recendo, my brother.  It was an

16   interpreter mistake.  He said he went towards

17   me instead of he fell on top of me.  That's the

18   correction.

19        **PRESIDING COMMISSIONER ST. JULIEN:**

20   That's fine. So are other people at this time

21   when you're in the struggle with the person who

22   was stabbed, who was fighting your brother?

23        **INMATE HERNANDEZ THROUGH INTERPRETER:**  It

24   was a person.  The last name was Cervantes.

25   And two or three friends of his.  Total they

26   were four.

27        **PRESIDING COMMISSIONER ST. JULIEN:**  So

16

1   what did you think you stabbing one of them --
2   I mean the other people were still fighting
3   your brother, so why were you stabbing anybody?
4   Why weren't you trying to get the other guys
5   off of your brother?

6          **INMATE HERNANDEZ THROUGH INTERPRETER:**
7   Because they were hitting him.  And I was being
8   beaten as well.  And I was angry.

9          **PRESIDING COMMISSIONER ST. JULIEN:**  So,
10  did you think about doing anything else?  Did
11  you think about trying to run away and call the
12  police?

13          **INMATE HERNANDEZ THROUGH INTERPRETER:**
14  No, well I just said call the ambulance and I
15  left the scene.

16          **PRESIDING COMMISSIONER ST. JULIEN:**
17  Before you stabbed Philippe Cervantes, do you
18  think there was anything else you could have
19  done besides stab him?

20          **INMATE HERNANDEZ THROUGH INTERPRETER:**  I
21  just wanted to separate them.  But I had been
22  beaten and I was angry.

23          **PRESIDING COMMISSIONER ST. JULIEN:**  So
24  then do you think that you killed Cervantes
25  because you were angry?

26          **INMATE HERNANDEZ THROUGH INTERPRETER:**
27  No.  I didn't want to kill him.  I only wanted

17

1   to scare him.

2         PRESIDING COMMISSIONER ST. JULIEN:   But

3   stabbing him several times, that's more than

4   scaring him.

5         INMATE HERNANDEZ THROUGH INTERPRETER:

6   That's how the things happened.  And I am sorry

7   for what happened, really sorry.

8         PRESIDING COMMISSIONER ST. JULIEN:   How

9   would he do things differently now?

10        INMATE HERNANDEZ THROUGH INTERPRETER:   I

11  would run away from the problem.

12        PRESIDING COMMISSIONER ST. JULIEN:   And

13  what would you tell your brother to do?

14        INMATE HERNANDEZ THROUGH INTERPRETER:

15  Same thing.  It's not only me who suffers in

16  here.  It's also my children and my whole

17  family.  It was a big mistake I made and that's

18  the reason I'm here.

19        PRESIDING COMMISSIONER ST. JULIEN:   How

20  have you come to realize that you made a

21  mistake.

22        INMATE HERNANDEZ THROUGH INTERPRETER:

23  How did I realize?  Because a person died.  And

24  it hurts me as well.  Because it's not good to

25  take away anyone's life.  I have been beaten.

26  And I had three or four beers.  And that's what

27  happened.

18

1          PRESIDING COMMISSIONER ST. JULIEN:  And

2    who started the fight?

3          INMATE HERNANDEZ THROUGH INTERPRETER:

4    They did with my brother Rocendo.

5          PRESIDING COMMISSIONER ST. JULIEN:  Have

6    you had any self help classes while you have

7    been in prison?

8          INMATE HERNANDEZ THROUGH INTERPRETER:  In

9    here, yes.  I have been to three.

10          PRESIDING COMMISSIONER ST. JULIEN:

11    Three.  And how have they helped you or have

12    they helped you?

13          INMATE HERNANDEZ THROUGH INTERPRETER:  To

14    forgive and help other people.  That's what

15    helped me.

16          PRESIDING COMMISSIONER ST. JULIEN:  In

17    1988 you were convicted of carrying a concealed

18    weapon in a public place.  And you got 24

19    months probation.  What type of a concealed

20    weapon was that?

21          INMATE HERNANDEZ THROUGH INTERPRETER:  It

22    was a gun.  It was a 32.

23          PRESIDING COMMISSIONER ST. JULIEN:  You

24    were on probation right, 2 years?

25          INMATE HERNANDEZ THROUGH INTERPRETER:

26    Yes.

27          PRESIDING COMMISSIONER ST. JULIEN:  Was

19

1    it a condition of your probation not to have

2    anymore concealed weapons or weapons at all?

3         **INMATE HERNANDEZ THROUGH INTERPRETER:**

4    No.

5         **PRESIDING COMMISSIONER ST. JULIEN:** Well

6    I don't have the written conditions of your

7    probation here but I would assume that it would

8    be a condition of your parole not to have any

9    weapons concealed or otherwise on your person.

10   Why did you feel you needed to carry weapons?

11   First the gun then the knife.

12        **INMATE HERNANDEZ THROUGH INTERPRETER:**

13   Back at that time I would peel oranges for my

14   son with a knife.  And when I went to see my

15   Rocendo, my brother, at that place where the

16   accident happened, I put it in my pocket.  I

17   didn't put it in the kitchen drawer.  Usually I

18   would put it in my pocket.  And when they beat

19   on me, I remembered I had a knife.  I didn't

20   want to use it.  But they were hitting my

21   brother Rocendo.  And I didn't want to injure.

22   I feel bad for what I did.  I am in your hands.

23   And I would like you to look at my behavior in

24   prison for all these years.

25        **PRESIDING COMMISSIONER ST. JULIEN:** Okay.

26   Were going to get to that.  A minute ago you

27   said that you refer to this incident as an

20

1    accident.  Do you think it was an accident?

2         INMATE HERNANDEA THROUGH INTERPRETER:

3    Not really.  But I see it that way because I

4    didn't want to do it.

5         PRESIDING COMMISSIONER ST. JULIEN:  Okay,

6    but, you did do it.  Is that correct?

7         INMATE HERNANDEZ THROUGH INTERPRETER:

8    Yes.

9         PRESIDING COMMISSIONER ST. JULIEN:  Do

10   you take responsibility?

11        INMATE HERNANDEZ THROUGH INTERPRETER:

12   Yes.

13        PRESIDING COMMISSIONER ST. JULIEN:  So

14   how was it an accident?

15        INMATE HERNANDEZ THROUGH INTERPRETER:

16   Well, for me it was in self defense.

17        PRESIDING COMMISSIONER ST. JULIEN:  Did

18   Mr. Cervantes have a weapon?

19        INMATE HERNANDEZ THROUGH INTERPRETER:

20   Yes.

21        PRESIDING COMMISSIONER ST. JULIEN:  What

22   did he have?

23        INMATE HERNANDEZ THROUGH INTERPRETER:  He

24   had a kitchen knife.

25        PRESIDING COMMISSIONER ST. JULIEN:  Did

26   you see it?

27        INMATE HERNANDEZ:  Yes.

21

1          PRESIDING COMMISSIONER ST. JULIEN:  Was

2    he brandishing it, was he waving it?

3          INMATE HERNANDEZ THROUGH INTERPRETER:  He

4    was fighting with my brother Rocendo and my

5    brother had him like this, he was holding his

6    hand like that and his knife was there.  We

7    were cutting lots of fruit.  They call it pico

8    de gallo.  That's why that knife was there.  He

9    had grabbed it.

10         PRESIDING COMMISSIONER ST. JULIEN:  Who,

11   Cervantes?

12         INMATE HERNANDEZ THROUGH INTERPRETER:

13   Yes, Cervantes.

14         PRESIDING COMMISSIONER ST. JULIEN:

15   Cervantes had a knife?

16         INMATE HERNANDEZ THROUGH INTERPRETER:

17   Yes, he had it like this.

18         PRESIDING COMMISSIONER ST. JULIEN:  Where

19   was your brother?

20         INMATE HERNANDEZ THROUGH INTERPRETER:  My

21   brother was holding his hand like this.

22         PRESIDING COMMISSIONER ST. JULIEN:  And

23   the knife was in his hand?

24         INMATE HERNANDEZ THROUGH INTERPRETER:

25   Yes.

26         PRESIDING COMMISSIONER ST. JULIEN:  So

27   why do you think you got convicted of second

22

1   degree murder if it was self defense?

2        INMATE HERNANDEZ THROUGH INTERPRETER:

3   Because that was my mistake in court.  I was

4   young.  I was scared for what I had done.  And

5   I denied I had killed him.  Because I was

6   scared.

7        PRESIDING COMMISSIONER ST. JULIEN:  So

8   they charged you with murder?

9        INMATE HERNANDEZ THROUGH INTERPRETER:

10  Yes.

11       PRESIDING COMMISSIONER ST. JULIEN:  Okay,

12  so you had had some prior arrests and

13  convictions, is that correct?  Do you remember

14  how old you were in 1983?

15       INMATE HERNANDEZ THROUGH INTERPRETER:  In

16  83 I was 20.

17       PRESIDING COMMISSIONER ST. JULIEN:  You

18  were convicted of -- you committed a robbery.

19  In Culver City, you were convicted for four

20  years, you received four years in state prison.

21  Is that correct?

22       INMATE HERNANDEZ THROUGH INTERPRETER:

23  Yes.

24       PRESIDING COMMISSIONER ST. JULIEN:  Okay,

25  what did you rob?

26       INMATE HERNANDEZ THROUGH INTERPRETER:  We

27  were two.  It was me and another one.  I was

23

1    accompanying him.  I found a gun in a trash
2    can.  It had been broken.  It seems it was a
3    32.  My buddy, he said, let's go and lets take
4    away this car from this person.  And that's
5    what happened, we took that car away.

6        **PRESIDING COMMISSIONER ST. JULIEN:**  But I
7    am talking about the year before. In 1983 you
8    were arrested for robbery.  And I think it was
9    February you were arrested for car theft.

10        **INMATE HERNANDEZ THROUGH INTERPRETER:**  In
11   what year?

12        **PRESIDING COMMISSIONER ST. JULIEN:**  It
13   was July 21st, 1983.  Because robbery wouldn't
14   be a car, it would be a person.  Did you steal
15   something from someone?

16        **INMATE HERNANDEZ THROUGH INTERPRETER:**  We
17   just took that car away.  That is what happened
18   in 83.

19        **PRESIDING COMMISSIONER ST. JULIEN:**  Well,
20   I have a car --

21        **ATTORNEY CHRISTENSEN:**  If that was the
22   grand theft, I don't know.  On the rap sheet
23   here it just says for 87.3 grand theft.  It is
24   grand theft auto.  But the disposition is that,
25   that particular charge, count one was dismissed
26   in the furtherance of justice and he was only
27   convicted on count two.

24

1          **PRESIDING COMMISSIONER ST. JULIEN:**
2    Actually, I was looking at the board report.  I
3    don't know if its --
4          **ATTORNEY CHRISTENSEN:**  Apparently it
5    refers to the --.
6          **PRESIDING COMMISSIONER ST. JULIEN:**  I
7    don't know if it's correct or not.  I has an
8    arrest for robbery with four years state
9    prison.  What did you get a four year state
10   prison terms for?
11         **INMATE HERNANDEZ THROUGH INTERPRETER:**
12   That's what I was given.
13         **PRESIDING COMMISSIONER ST. JULIEN:**  That
14   says in 1983 and then it was 1984 you were
15   arrested for grand theft.  So unless you were
16   not in prison yet.
17         **INMATE HERNANDEZ THROUGH INTERPRETER:**
18   Did you say theft or robbery?
19         **PRESIDING COMMISSIONER ST. JULIEN:**  Is
20   that not correct?
21         **INMATE HERNANDEZ THROUGH INTERPRETER:**  It
22   is not.
23         **PRESIDING COMMISSIONER ST. JULIEN:**  Okay,
24   the I will have to try to read this record.
25   Let me go back to the record.
26         **DISTRICT ATTORNEY MORRISON:**  The record
27   shows that he was given a five year enhancement

25

1   for the serious felony conviction of robbery

2   prior from 1984 on this case.  It was robbery

3   and he went to prison for it.  Because it was

4   also alleged as a 667.5.

5        **PRESIDING COMMISSIONER ST. JULIEN:**  Okay,

6   that's what happened.  And then he was paroled

7   by CDC.  Then in 1988 that was for carrying the

8   concealed weapon.  And you got 20 days jail and

9   probation.  You said you were using the gun for

10  target practice?

11       **INMATE HERNANDEZ THROUGH INTERPRETER:**

12  No.  I bought it at a gun shop.  And I was

13  going to sell that gun.  The person that was

14  about to buy it from me, told me, why don't you

15  try to shoot it and see if it works.

16       **DEPUTY COMMISSIONER MEJIA:**  Did he buy it

17  from a store?  A gun store?  You are a

18  convicted felon and they sold you a gun?

19       **INMATE HERNANDEZ THROUGH INTERPRETER:**

20  They sold it to me. I wanted it for self

21  defense in my house. (indiscernible)

22       **DEPUTY COMMISSIONER MEJIA:**  Did you use

23  your name to buy the gun?

24       **INMATE HERNANDEZ THROUGH INTERPRETER:**

25  Yes, I used my real name.  Benjamin Hernandez.

26       **DEPUTY COMMISSIONER MEJIA:**  That is

27  unbelievable.  He has a conviction of felony

26

1   and gets a gun, buys from a store.

2           PRESIDING COMMISSIONER ST. JULIEN:  So

3   you were - You are on probation at the time of

4   this fight?  And that was for the gun offense?

5           INMATE HERNANDEZ THROUGH INTERPRETER:

6   Yes

7           PRESIDING COMMISSIONER ST. JULIEN:  You

8   came here illegally from Mexico, is that

9   correct?

10          INMATE HERNANDEZ THROUGH INTERPRETER:

11  Yes.

12          PRESIDING COMMISSIONER ST. JULIEN:  And

13  your parents are still in Mexico?  Is that

14  correct?

15          INMATE HERNANDEZ THROUGH INTERPRETER:

16  No, they live here.

17          PRESIDING COMMISSIONER ST. JULIEN:  Oh,

18  they do?

19          INMATE HERNANDEZ THROUGH INTERPRETER:

20  Yes.

21          PRESIDING COMMISSIONER ST. JULIEN:  This

22  is an old report.  But anyway, I guess at this

23  time in 2001 it says you don't know where your

24  mother is located and that your father resides

25  in Mexico.

26          INMATE HERNANDEZ THROUGH INTERPRETER:

27  Yes, back then.

27

1          **PRESIDING COMMISSIONER ST. JULIEN:**  So

2     have they recently relocated to the US?

3          **INMATE HERNANDEZ THROUGH INTERPRETER:**  My

4     father used to live in Mexico.  My mother has

5     been living in this country for many years.

6          **PRESIDING COMMISSIONER ST. JULIEN:**  Do

7     you keep in touch with them?

8          **INMATE HERNANDEZ THROUGH INTERPRETER:**

9     Yes,

10         **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

11    And you're married and are you married to the

12    same person you were when this crime happened?

13         **INMATE HERNANDEZ THROUGH INTERPRETER:**

14    Yes.

15         **PRESIDING COMMISSIONER ST. JULIEN:**  What

16    about children.

17         **INMATE HERNANDEZ THROUGH INTERPRETER:**

18    There okay.

19         **PRESIDING COMMISSIONER ST. JULIEN:**  How

20    old are they now?

21         **INMATE HERNANDEZ THROUGH INTERPRETER:**

22    One is 24, the other one 22.  One is 16 and I

23    have a nine year old.

24         **PRESIDING COMMISSIONER ST. JULIEN:**  How

25    do you think they would feel about having to go

26    back to Mexico if you're released and you're

27    deported?  The kids have always lived here?

28

1          **INMATE HERNANDEZ THROUGH INTERPRETER:**
2     The oldest ones won't go.  The youngest ones
3     would.
4          **PRESIDING COMMISSIONER ST. JULIEN:**
5     That's who I meant, the nine year old and the
6     16.  How do you think they would feel?
7          **INMATE HERNANDEZ THROUGH INTERPRETER:**
8     Alright.
9          **PRESIDING COMMISSIONER ST. JULIEN:**  Have
10    they been to Mexico on visits?
11         **INMATE HERNANDEZ THROUGH INTERPRETER:**
12    Yes.  They've gone to Mexico.
13         **PRESIDING COMMISSIONER ST. JULIEN:**  And
14    what about your wife?  How do you think she
15    would feel?
16         **INMATE HERNANDEZ THROUGH INTERPRETER:**
17    She has told me she would go.
18         **PRESIDING COMMISSIONER ST. JULIEN:**  Do
19    both you and your wife have family in Mexico?
20         **INMATE HERNANDEZ THROUGH INTERPRETER:**
21    Yes.
22         **PRESIDING COMMISSIONER ST. JULIEN:**  Do
23    you have brothers and sisters there?
24         **INMATE HERNANDEZ THROUGH INTERPRETER:**
25    No. Right now I only have aunts.
26         **PRESIDING COMMISSIONER ST. JULIEN:**  And
27    what about your wife?

29

1          **INMATE HERNANDEZ THROUGH INTERPRETER:**
2    She has sisters.

3          **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.
4    So we have a letter from Rosa Monbela M-O-N-B-
5    E-L-A. And she's your mother?

6          **INMATE HERNANDEZ THROUGH INTERPRETER:**
7    Yes.

8          **PRESIDING COMMISSIONER ST. JULIEN:**  And
9    she writes in June 2004 that she's an anguished
10   mother who is worried for her son and asks
11   mercy and consideration for you. And that as a
12   human being he did a big mistake but I also
13   believe that he has paid for what he did.  He
14   is a good man, hard worker, has a family, wife
15   and sons that are waiting for him.  He has his
16   own house in Heliska, Mexico and also counts
17   that your mother will support you economically
18   and spiritually.  She says I know my son
19   Benjamin has changed his life for good.  He
20   preaches the word of God in prison to his
21   fellow inmates.  And he looks for the wellbeing
22   of the people around him.  Please look at his
23   record.  Benjamin Hernandez Jr., who is your
24   son, and he also writes that he was five months
25   old, oh no, he was not yet born when you were
26   in prison.  Is that correct?

27          **INMATE HERNANDEZ THROUGH INTERPRETER:**

30

1    Yes.

2           PRESIDING COMMISSIONER ST. JULIEN:  Now

3    he is 15.  I've grown up without my father at

4    my side and the only time that I've been with

5    him is when I go to visit him at the prison

6    with my mother.  Dear Sir, I need my father by

7    my side.  He is very important to my life and

8    for my brother's life to.  We are waiting for

9    him.  We ask for mercy and consideration for my

10   father.  About how often are you able to see

11   your son?

12          INMATE HERNANDEZ THROUGH INTERPRETER:

13   Every four or five months they come to visit

14   me.

15          PRESIDING COMMISSIONER ST. JULIEN:  How

16   do you think they are adjusting, how do you

17   think there life is going so far?

18          INMATE HERNANDEZ THROUGH INTERPRETER:  I

19   didn't understand very well the question.

20          PRESIDING COMMISSIONER ST. JULIEN:  Is

21   your son doing well in school?  Is he working?

22   What is he doing?

23          INMATE HERNANDEZ THROUGH INTERPRETER:

24   The older ones work.

25          PRESIDING COMMISSIONER ST. JULIEN:  And

26   what about the 16 year old?

27          INMATE HERNANDEZ THROUGH INTERPRETER:  In

31

1   school.

2        PRESIDING COMMISSIONER ST. JULIEN:   And

3   the nine year old to, I would assume.  So what

4   about your drug and alcohol use?  I note that

5   you don't have any alcohol use, I mean drug

6   use, but what about your alcohol use?

7        INMATE HERNANDEZ THROUGH INTERPRETER:

8   When I was in the streets, yes, I would drink.

9   Not a lot but I did drink.

10       PRESIDING COMMISSIONER ST. JULIEN:   Did

11   you drink and get drunk often?

12       INMATE HERNANDEZ THROUGH INTERPRETER:   No

13       PRESIDING COMMISSIONER ST. JULIEN:   About

14   how many times a week do you think you would

15   get drunk?

16       INMATE HERNANDEZ THROUGH INTERPRETER:

17   Get drunk, I wouldn't get drunk like drunk.  No.

18        PRESIDING HERNANDEZ COMMISSIONER ST.

19   JULIEN:  Would you drink beer?

20        INMATE HERNANDEZ THROUGH INTERPRETER:

21   Beer.

22        PRESIDING COMMISSIONER ST. JULIEN:   The

23   night of the crime, how many beers did you

24   have?

25        INMATE HERNANDEZ THROUGH INTERPRETER:   I

26   think three or four beers.

27        PRESIDING COMMISSIONER ST. JULIEN:   So,

32

1    how often did you have three or four beers?

2          **INMATE HERNANDEZ THROUGH INTERPRETER:**   In

3    how much time?

4          **PRESIDING COMMISSIONER ST. JULIEN:**   A

5    week.

6          **INMATE HERNANDEZ THROUGH INTERPRETER:**

7    Once a week.

8          **PRESIDING COMMISSIONER ST. JULIEN:**   So do

9    you think you had an alcohol problem?

10         **INMATE HERNANDEZ THROUGH INTERPRETER:**

11   Maybe, yes.   Because in here, I was recommended

12   to go to AA.

13         **PRESIDING COMMISSIONER ST. JULIEN:**   That

14   is why I am bringing this up.   In the

15   psychological evaluation it talks about, that

16   you probably, most likely had an alcohol

17   problem but you didn't really think that you

18   did.   So, right now how do you feel about

19   drinking three or four beers once a week?

20         **INMATE HERNANDEZ THROUGH INTERPRETER:**   I

21   don't think about drinking anymore.   When I am

22   here, besides working, I do other things.

23         **PRESIDING COMMISSIONER ST. JULIEN:**   Like

24   what?

25         **INMATE HERNANDEZ THROUGH INTERPRETER:**   I

26   am a minister of God's word.   I've been doing

27   this for years.   I know what I did and I feel

33

1    bad.  And I will so note that my life has

2    changed.  I don't have problems with alcohol.

3    I keep on going to AA because they talk about

4    God.  And it's an opportunity to talk about the

5    only thing that can change your life.

6          **PRESIDING COMMISSIONER ST. JULIEN:**  And

7    what's that?

8          **INMATE HERNANDEZ THROUGH INTERPRETER:**

9    Jesus Christ, God.

10         **PRESIDING COMMISSIONER ST. JULIEN:**  Why

11   do you think that you originally denied

12   committing this crime?

13         **INMATE HERNANDEZ THROUGH INTERPRETER:**  I

14   denied it when I went to court and when I was

15   going to court.

16         **PRESIDING COMMISSIONER ST. JULIEN:**  Why?

17         **INMATE HERNANDEZ THROUGH INTERPRETER:**

18   Because I was scared. And I was young.  I have

19   matured now.  I am growing old in prison.

20         **PRESIDING COMMISSIONER ST. JULIEN:**  Just

21   a minute, we have to change the tape.

22         **INMATE HERNANDEZ THROUGH INTERPRETER:**

23   The mentality I had years ago, I don't have it

24   now.

25         **PRESIDING COMMISSIONER ST. JULIEN:**  Also,

26   why did he leave the country and go to Mexico

27   after the crime?

34

1          **INMATE HERNANDEZ THROUGH INTERPRETER:**   I

2     didn't go to Mexico.

3          **PRESIDING COMMISSIONER ST. JULIEN:**   So

4     you didn't leave.   Well, I have that on my

5     notes.   So you stayed here the entire time?

6          **INMATE HERNANDEZ THROUGH INTERPRETER:**

7     Yes.

8          **PRESIDING COMMISSIONER ST. JULIEN:**   Let

9     me look and see where I found that.   Okay,

10    Commissioner Mejia.

11         **DEPUTY COMMISSIONER MEJIA:**   I think I

12    will bring institutional adjustment to this

13    hearing since your last board appearance.   I

14    have reviewed your central file and board

15    reports and psychiatric reports.   If I miss

16    anything, I will be giving you and your

17    attorney the opportunity to make comments at

18    the end of my presentation.   The last board

19    appearance was on April 23rd, 2002, 4/23/02,

20    decision was for you to be denied three years.

21    And recommendations were for you to become and

22    remain (indiscernible) free (indiscernible).

23    Participate in self help and therapy.   Custody

24    level is medium A.   Classification score is 19.

25    Current work assignment, I think he works for

26    the textiles.   And academic take score is 5.6

27    no GED yet.  He tried but didn't.   Has he

35

1   continued to try for his GED?

2        **INMATE HERNANDEZ THROUGH INTERPRETER:** No

3        **DEPUTY COMMISSIONER MEJIA:** I don't see,

4   counsel I don't see any cronos stating that he

5   plateaued on his --

6        **ATTORNEY CHRISTENSEN:** No, but he tells

7   me that there is supposed to be one. Is that

8   correct? When you were in the education

9   program, did you get a cronos that you had gone

10  about as far as you could?

11       **INMATE HENANDEZ THROUGH INTERPRETER:**

12  Yes, the officer has it on here right now. He

13  has the cronos. Oh, I have it here.

14       **ATTORNEY CHRISTENSEN:** You have it. This

15  is from 2000, yes, I will read this. It says,

16  inmate has been assigned to basic education

17  since April 1999. It is the date of September

18  25th, 2001. The part that you are asking about,

19  it says unfortunately, inmate Hernandez has

20  great difficulty testing due to the language

21  barrier. And he has not been able to improve

22  his test scores in these areas. However, he

23  has had excellent success with his computation

24  skills and has successfully completed -- It

25  does not say he has plateaued, this is what he

26  believes.

27       **DEPUTY COMMISSIONER MEJIA:** Thank you. I

36

1    saw it and that's what I was reading to it and
2    it not say that he has plateaued and have been
3    removed.

4         ATTORNEY CHRISTENSEN:  I have seen that
5    type of cronos.  It does say plateaued and your
6    right, this one does not.  I thought he had
7    something else.

8         DEPUTY COMMISSIONER MEJIA:  He has
9    completed no vocation yet.  He has been
10   attending self help.  Looks like he has been
11   attending since 1998, AA.  He presented the
12   cronos here, current one for August 9th, 2005.
13   That he has been attending AA.  And bitter and
14   anger management certificate, January 27th,
15   2004.  September 7th, 2004, Christian basic
16   class.  October 10th, 2003, completed tier one
17   of the great news of the bible.  May 7th, 2002,
18   breaking barriers program.  And it continued
19   from July, September, October, November has
20   been attending the life prisoner's support
21   group of 2001. So that is just is self help
22   group that he has attended in this period
23   between 2002 and this present time.  Any
24   additions to that?

25        ATTORNEY CHRISTENSEN:  That is all I am
26   aware of.

27        DEPUTY COMMISSIONER MEJIA:  Disciplinary

37

```
 1   history, two 115's, one in 1992 and one 1990.
 2   The last being in 1992.  Three 128A's, two in
 3   1991 and one in 1997.  The last being in 1997.
 4   Actually, there is four.  The last being on May
 5   18th, 1998.  No gang affiliation was noted.  And
 6   we are going to go to the psychiatric report
 7   dated July 5th, 2001.  By Doctor Silverstein
 8   spelled as S-I-L-V-E-R-S-T-E-I-N, licensed
 9   psychologist, and it's noted at the time, this
10   is four years ago, appeared to be of low
11   average and average intelligence.  Access one
12   adult antisocial behavior.  Alcohol abuse
13   disorder in remission in controlled
14   environment.  Access two deferred.  Access
15   three non-reported.  Access four psychosocial
16   stressors.  Access five global assessment
17   functioning of 75.  In access four is
18   psychosocial stressors for incarceration.  An
19   assessment of dangerousness is adjustment to
20   prison appears to be good.  There appears to be
21   only two 115's in his record.  And one involved
22   the production of pruno, and the other for not
23   laying down when ordered to during an alarm.
24   He also has a attended AA and lifer support
25   groups.  He stated that he got along with
26   others.  And that his current cell mate is also
27   a Christian and they get along well.  Given the
```

38

1    lack of disciplinary history and his active

2    participation in posthumous activities it would

3    appear that this inmate is less likely than

4    most to reengage in dangerous or criminal

5    behavior in the future. It would be my opinion,

6    based on the above noted information that this

7    inmate has a better than average chance of

8    making a positive adjustment to parole.  This

9    man, who appears to have had drinking problems,

10   which he continues to minimize to some extent.

11   He does appear remorseful and appears genuine

12   in his desire to change his life.  He has had a

13   religious conversion while in the county jail.

14   And that he has a new heart.  There is no

15   mental health history other than the alcohol

16   abuse and adult antisocial behavior.  Given the

17   lack of mental health involvement, parole

18   consideration should be based on issues other

19   than psychiatric ones this time.   Any

20   additions counsel?

21          ATTORNEY CHRISTENSEN:  No, I don't have

22   any.

23          DEPUTY COMMISSIONER MEJIA:  Let me return

24   this back to the chair.

25          PRESIDING COMMISSIONER ST. JULIEN:  How

26   old was Mr. Cervantes?

27          INMATE HERNANDEZ THROUGH INTERPRETER:  I

39

1   don't know, I didn't know him.

2           PRESIDING COMMISSIONER ST. JULIEN:   Was

3   he older than you?

4           INMATE HERNANDEZ THROUGH INTERPRETER:   He

5   looked older.

6           PRESIDING COMMISSIONER ST. JULIEN:

7   Because when the judge sentenced you, he said

8   that he didn't think that a man of Mr.

9   Cervantes age would be able to do you and your

10  younger brother any harm.  Did Mr. Cervantes

11  fight back with your brother?

12          INMATE HERNANDEZ THROUGH INTERPRETER:

13  Yes.

14          PRESIDING COMMISSIONER ST. JULIEN:   It

15  also states that there is no evidence that

16  anybody else had a knife.

17          INMATE HERNANDEZ THROUGH INTERPRETER:

18  That's what the witnesses said.

19          DISTRICT ATTORNEY MORRISON:   I saw that

20  in the sentencing transcript and I thought it

21  might be an elderly victim but the police

22  reports say that he was 31 years of age.

23          PRESIDING COMMISSIONER ST. JULIEN: Okay,

24  that's what I was just looking at.  I haven't

25  yet found the age.  Do you still contend that

26  Mr. Cervantes had a knife?

27          INMATE HERNANDEZ THROUGH INTERPRETER:

40

1    Yes, because it was there.

2          **PRESIDING COMMISSIONER ST. JULIEN:**    Mr.

3    Morrison, do have questions for Mr. Hernandez?

4          **DISTRICT ATTORNEY MORRISON:**    No, thank

5    you.

6          **PRESIDING COMMISSIONER ST. JULIEN:**    And

7    Ms. Christensen?

8          **ATTORNEY CHRISTENSEN:**    Did Mr. Cervantes

9    deserve to loose his life?

10          **INMATE HERNANDEZ THROUGH INTERPRETER:**

11    No.

12          **ATTORNEY CHRISTENSEN:**    You think you were

13    drinking on that day?

14          **INMATE HERNANDEZ THROUGH INTERPRETER:**

15    Yes.

16          **ATTORNEY CHRISTENSEN:**    Do you think that

17    this crime would have occurred had you not been

18    drinking?

19          **INMATE HERNANDEZ THROUGH INTERPRETER:**

20    No.    I think not.

21          **ATTORNEY CHRISTENSEN:**    If you were to

22    return to Mexico, would you participate in AA

23    there?

24          **INMATE HERNANDEZ THROUGH INTERPRETER:**

25    Yes, because Alcoholics Anonymous give you the

26    opportunity to speak about Jesus Christ

27    ministry.    That's why.

41

1       **ATTORNEY CHRISTENSEN:** What can you tell

2  this board, to give them the confidence that

3  you would not act violently if you were in a

4  situation where you believe that you needed to

5  get revenge?

6       **INMATE HERNANDEZ THROUGH INTERPRETER:**

7  I'm guided by the word of God. God's word

8  says, a wise man sees evil and steps away.

9  That's why.

10      **ATTORNEY CHRISTENSEN:** Would you be able

11  to completely stay away from possessing any

12  weapons, knives, and guns?

13      **INMATE HERNANDEZ THROUGH INTERPRETER:**

14  Yes, because that weapon that I used cost that

15  I spent a lot of years in prison. And it's not

16  only me that is suffering, my children as well

17  and they need me. Especially the ones in the

18  middle. Right now, when people fight, I don't

19  like to see that. It hurts me. I makes me

20  feel bad.

21      **ATTORNEY CHRISTENSEN:** Who lives on the

22  family property in Helisko now?

23      **INMATE HERNANDEZ THROUGH INTERPRETER:** We

24  are renting the house these days. There are

25  two houses that we have. And my mother goes

26  twice a year to pay the contribution for those

27  houses.

42

1    **ATTORNEY CHRISTENSEN**:  Is it the idea
2    that you and your family would then occupy that
3    house?

4    **INMATE HERNANDEZ THROUGH INTERPRETER**:
5    Yes.

6    **ATTORNEY CHRISTENSEN**:  What would you do
7    for work?

8    **INMATE HERNANDEZ THROUGH INTERPRETER**:
9    First I would work as a welder.  Afterwards I
10   would get involved in ministry.  Where people
11   go and preach in prisons.

12   **ATTORNEY CHRISTENSEN**:  Have you looked
13   into employment in Mexico, in the area you
14   would like to live?

15   **INMATE HERNANDEZ THROUGH INTERPRETER**:
16   No, but I know that I will find it.  As far as
17   my father is concerned, he has property in
18   Michoacán.  There is a lot of things one can do
19   and there is money so one can live.  About
20   work, I am planning to work, yes.

21   **ATTORNEY CHRISTENSEN**:  Thank you Mr.
22   Hernandez.  I have no further questions.

23   **PRESIDING COMMISSIONER ST. JULIEN**:  I am
24   going back to this about Mexico.  Because in
25   the probation officers report it says that they
26   theorize that you and your brother went to
27   Mexico to get your brother some medical

43

1    treatment for the wound that he suffered.  So

2    is that not true?

3         **INMATE HERNANDEZ THROUGH INTERPRETER:**

4    No, I didn't go to Mexico.  He did go to

5    Mexico.  I did not go.

6         **PRESIDING COMMISSIONER ST. JULIEN:**  Do

7    you have a closing statement Mr. Morrison?

8         **DISTRICT ATTORNEY MORRISON:**  Yes, thank

9    you.  The district attorney opposes parole for

10   the inmate.  I believe that the inmate has not

11   come to grips with the actual facts of the

12   crime nor being truthful to the panel.  I would

13   note that the statement of facts that were

14   presented at trial in the appellate opinions

15   are different from the board report and with

16   the inmate has told the panel today.  And it

17   shows a more aggressive lack of self defense

18   position the evidence at trial than the inmate

19   is trying to convey.  It directly contradicts

20   what the inmate has told the panel under oath

21   today.  I would just like to read a brief

22   portion of that into the record.  Number of

23   people were someplace else -- After their

24   arrival at Navarro's home, a relative of

25   Cervantes, most of the people present,

26   including Philippe Cervantes and appellant, the

27   appellant is the inmate, continued drinking

44

1    without any apparent provocation, appellant

2    stated that he wanted to fight with Philippe

3    Cervantes because he did not like him.

4    Philippe Cervantes replied that he did not want

5    to fight and walked away from appellant.  As

6    appellant approached Philippe Cervantes,

7    appellant pulled the knife out of his back

8    pocket and held it open in his right hand.

9    Appellant grabbed Philippe Cervantes from

10   behind, turned him around, and stabbed him in

11   the stomach.  That is not what the inmate has

12   presented here.  I realize the board talks

13   about him coming to aid his brother but it

14   seems to be a almost premeditated attack with

15   out provocation.  Certainly not in self defense

16   nor in defense of others.  So it is an

17   unjustified killing and as the chair mentioned,

18   the sentencing judge talked about it on page

19   three of the sentencing transcript, quote "this

20   is one of the most perfectly absolutely

21   senseless killings."  The victim was having a

22   fight with inmate's brother; he jumps into the

23   fight, cuts him with a knife, and stabs him a

24   number of times.  Anytime you plunge a knife to

25   the hilt in somebody's body you run the risk of

26   that person dying either as a result of your

27   cut or for anything else that will happen.  No

45

1     reason to have done what he did.  The judge

2     then went on to mention that the inmate had a

3     (indiscernible) for weapons after committing

4     the armed robbery, he none the less is only

5     prosecuted for a misdemeanor carrying a

6     concealed firearm which is then discussed here.

7     It is very difficult to believe that the inmate

8     using his true name in which he has already

9     been in prison for armed robbery would have

10    been able to purchase a firearm in the mid

11    1980's.  There were CII checks to prevent it.

12    Either he is not being truthful to where he

13    bought it or something is fishy.  The inmates

14    prior rehabilitating efforts by the State of

15    California in terms of sentencing to prison for

16    armed robbery did not prevent him from

17    violating the laws by carrying firearm nor does

18    it appear that he was on probation for that

19    misdemeanor at the time of this offense.  The

20    chair correctly noted that conditions of

21    probation for weapons offenses are do not use

22    or posses any dangerous or deadly weapons.  So

23    he had a knife on his person which he used to

24    end Mr. Cervantes life.  We appreciate the

25    inmate appears to have a religious conversion.

26    Appears motivated to do good, but he needs to

27    spend a longer time here for this crime before

46

1    he is out of danger to the people of this
2    country.  Even the poorest borders, if he is
3    deported, there is nothing to prevent him from
4    coming back.  I did not see any parole plans in
5    California.  For these reasons, we believe he
6    is unsuitable at this time and ask for another
7    multi year denial.
8         **ATTORNEY CHRISTENSEN:**  We believe that
9    Mr. Hernandez is suitable for parole and should
10   be permitted to return to Mexico.  I am looking
11   back at the transcript of the hearing last time
12   and I just want to point out with regard to his
13   GED since that is something that was brought up
14   here.  There's a discourse here between the
15   inmate and the commissioner and at that time
16   Mr. Hernandez did say that he is not able to
17   learn anymore English and it seems that the
18   upshot wasn't that, that the commissioner said,
19   well that's fine, it's only if you can and if
20   you can't we understand the limitations.  So
21   Mr. Hernandez has done as well as he can in
22   here given the fact that he is not a native
23   speaker of English.  All the classes that he
24   takes he's had to really put forth a lot of
25   effort because they are not in Spanish.  None
26   the less he has taken a great deal of self
27   help.  Most notably is the fact that he spends

1    a lot of his time in religious endeavors.  This

2    is extremely important to him.  That in as of

3    it self would act as a deterrent to any further

4    violence if we accept as fact that he has

5    obtained religious conversion.  He is a very

6    hard worker here in prison.  He has not been

7    able to attain a vocation thus far but that may

8    be because of his reading level.  He probably

9    just not at that level yet where he is able to

10   be eligible for a lot the vocations.  I also

11   think that he may have misunderstood the cronos

12   that he had because I think he believes he

13   really has plateaued even though that is not

14   what the cronos says.  But, be that as it may

15   it is some what limiting in his ability to

16   program.  The crime, he has accepted

17   responsibility.  He does accept what he did as

18   something that is very, very wrong.  He does

19   have respect for human life.  He would not act

20   that way again.  He is older, his judgment has

21   improved, he is more mature.  He has a lot to

22   look forward to.  He has maintained his contact

23   with his family, his mother, his children, and

24   his wife.  His wife and his youngest children

25   would relocate with him back to Mexico.  I

26   can't see him coming back to this country and

27   facing the possibility of life in prison again.

48

1    I believe that he has learned his lesson.  All

2    in all, Mr. Hernandez has tried to the best of

3    his ability to been seen as suitable in the

4    eyes of the board and he hopes that you will

5    consider his bid to be paroled today in a

6    favorable way.  Thank you.

7         PRESIDING COMMISSIONER ST. JULIEN:  And

8    Mr. Hernandez, do you have anything to add

9    regarding your suitability for parole?

10        INMATE HERNANDEZ THROUGH INTERPRETER:  I

11   just hope to get my out date.  I believe as far

12   as you are concerned you can't see me changed.

13   But I know I have changed.  And I know I am

14   growing old here in prison.  If I am released

15   when I am older what would be the reason?

16   Right now I still can work.  I still have two

17   children that I can advise personally.  And I

18   want you to be sure if I get my out date, I

19   won't be back to this country.  I have means to

20   live in Mexico.  When I was a child I was very

21   young.  That is when I came to this country.  I

22   have learned my lesson.  It's all in your hands

23   and God's hands.

24

25

26

27

49

1          **PRESIDING COMMISSIONER ST. JULIEN:**   Okay

2     Sir, thank you very much.   We will now recess

3     for deliberations.

4                    **R E C E S S**

5                       --oOo—

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

1          CALIFORNIA BOARD OF PAROLE HEARINGS

2                    D E C I S I O N

3          DEPUTY COMMISSIONER Mejia:   Back on

4    record for our decision on Mr. Hernandez.

5          PRESIDING COMMISSIONER ST. JULIEN:   Okay

6    and all parties have returned to the room.   And

7    Sir, the panel has reviewed all the information

8    from the public and relied on the following

9    circumstances in concluding that the inmate in

10   not suitable for parole and puts an unreasonable

11   risk of danger to society or a threat to public

12   safety if released from prison.   And

13   specifically, as it relates to the commitment

14   offense, the offense was carried out in a

15   specially cruel and callous manner in that the

16   inmate pulled a knife during a altercation with

17   the victim, his brother, and other individuals

18   who were at the scene.   The inmate proceeded to

19   stab the victim several times which led to his

20   death.   The offense was carried out in a

21   dispassionate manner.   In that the inmate and

22   his brother, after he inmate stabbed the victim,

23   left the scene without trying to give and aid to

24   the victim or even learning of his condition.

25   The offense was carried out in a manner which

26   demonstrates an exceptionally callous disregard

27   BENJAMIN HERNANDEZ E-51808 DECISION PAGE 1 9/28/05

51

1    for human suffering, in that flailing this knife

2    the inmate could have injured other people and

3    the inmate also had an opportunity to not draw

4    his knife and stab the victim and he also could

5    not have engaged in the fight to begin with.

6    The motive for the crime is inexplicable and

7    it's trivial.  I still don't quite understand

8    how this stabbing happened or why it happened.

9    We have an argument for donuts; we have an

10   argument, a long standing argument between him

11   and your brother.  I'm not really quite sure

12   what the provocation was.  And these conclusions

13   are drawn from the facts as they are presented

14   in the appeal and on page three of the appeal, I

15   am going to read where it begins on the second

16   paragraph, where it states that without any

17   apparent provocation, the inmate, and he was in

18   the company of several other people as well as

19   his brother, and the victim Philippe Cervantes,

20   without any apparent provocation, the inmate

21   stated that he wanted to fight with Philippe

22   Cervantes because he did not like him.  Philippe

23   Cervantes replied that he did not want to fight

24   and walked away from the inmate.  As the inmate

25   approached Philippe Cervantes, inmate pulled a

26   knife out of his back pocket and held it open in

27   **BENJAMIN HERNANDEZ E-51808 DECISION PAGE 2 9/28/05**

52

1   his right hand.  Apparently the inmate grabbed

2   Philippe Cervantes from behind, turned him

3   around and stabbed him in the stomach.  Philippe

4   Cervantes fell to the ground and cried for help.

5   Mr. Cervantes got up and tried to defend himself

6   with his bare hands.  Another individual who was

7   on the scene, Mr. Ascevedo A-S-C-E-V-E-D-O, and

8   Arturo Cervantes who was the victims brother,

9   tried to grab the inmate.  Rocendo Hernandez

10  went to help the inmate and knocked Philippe

11  Cervantes down.  The inmate and Rocendo

12  Hernandez, the inmate's brother, jumped on top

13  of Philippe Cervantes.  Rocendo Hernandez was

14  not carrying a knife.  After the inmate stabbed

15  Mr. Cervantes he turned with the bloody knife

16  still in his hand and threatened Mata M-A-T-A

17  Ascevedo A-S-C-E-V-E-D-O, and Arturo Cervantes

18  C-E-R-V-A-N-T-E-S.  At some point during the

19  fight, a young woman that lived in the

20  apartments across the street, came and asked the

21  inmate and Rosario Hernandez to leave Philippe

22  Cervantes alone.  The inmate and Rosario

23  Hernandez left together.  Philippe Cervantes

24  subsequently died as a result of his stab

25  wounds.  The inmate has an escalating pattern of

26  criminal conduct and he also failed to profit

27  **BENJAMIN HERNANDEZ E-51808 DECISION PAGE 3 9/28/05**

53

1   from society's previous attempts to correct his

2   criminality in these attempts include, adult

3   probation as well as a prior prison term.  And

4   the inmate has unstable social history and prior

5   criminality which includes a proclivity for

6   carrying concealed weapons, robbery, grand theft

7   auto, and he actually was on probation for

8   carrying a concealed weapon at the time of the

9   offense.  The inmate has programmed in a limited

10  manner while incarcerated and has failed to

11  develop and marketable skill that could be put

12  to use upon his release.  He has also failed to

13  upgrade educationally and vocationally as

14  previously recommended by the board.  And we do

15  recognize that there are limitations with the

16  language, with the fact that you are not fluent

17  in English, however, we definitely need to

18  encourage you to try to do the best you can and

19  pursue more education and still continue to work

20  toward obtaining your GED because until you do

21  that, a lot of the programs in prison are not going

22  to be available to you and those are programs that

23  you need.  The psychological report dated July 5,

24  2001 authored by Doctor Silverstein, is favorable

25  in that he says the inmate is less likely than most

26  to re-offend and that he has a better than average

27  **BENJAMIN HERNANDEZ E-51808 DECISION PAGE 4 9/28/05**

54

1    chance of success in the community.  And although

2    the inmate appears to have realistic parole plans

3    in Mexico, he does not have viable residential

4    plans in the county of last legal residence and we

5    do not have a documented and verifiable evidence of

6    residence in Mexico or in California.  He does not

7    have acceptable employment plans, again, we see

8    nothing documented about employment plans.  And he

9    does not have a marketable skill.  In addition, the

10   hearing panel notes that, in response to 3042

11   notices, opposition to a finding of parole

12   suitability has been expressed by the district

13   attorney of Los Angeles County.  And the panel

14   makes the following findings, the inmate needs

15   therapy in order to face, discuss and understand

16   and cope with stress in a nondestructive manner.

17   Until progress is made the inmate continues to be

18   unpredictable to others.  Never the less, we would

19   like to commend Mr. Hernandez for being

20   disciplinary free since 1992 and that indeed Sir is

21   a significant accomplishment and we do commend you

22   for that.  Also for participating in self help

23   programs and AA.  Your Christian religious

24   activities.  Completing project Impact and Breaking

25   Barriers.  However, these positive aspects of your

26   behavior do not out weigh the factors of

27   **BENJAMIN HERNANDEZ E-51808 DECISION PAGE 5 9/28/05**

55

1    unsuitability.  In a separate decision, the hearing
2    panel finds that the inmate has been convicted of
3    murder and it is not reasonable to expect that
4    parole will be granted at a hearing during the next
5    four years.  And specifically the inmate committed
6    the offense in an especially cruel manner where
7    apparently according to the facts in the appeal,
8    completely with out provocation, the inmate tried
9    to engage the victim, Mr. Cervantes, in a fight.
10   Mr. Cervantes did not want to fight, so the inmate
11   pulled a knife on him, began to stab him.  The
12   stabbings led to Mr. Cervantes' demise.  The
13   offense was carried out in a dispassionate manner
14   and that certainly the victim had to have incurred
15   a significant amount of physical and emotional
16   trauma after having tried to flee the scene of a
17   fight, being attacked, and then subsequently
18   stabbed and I would assume that he bled to death.
19   The motive for the crime is inexplicable and that
20   we don't know what the motive was here.  We do know
21   however, that a man lost his life.  And in some of
22   your earlier conversation with us, when I was
23   trying to probe for your remorse or insight, you
24   did not mention the victim.  And you mentioned the
25   harm and the suffering that was caused your family
26   by your incarceration as well as you had been in
27   **BENJAMIN HERNANDEZ E-51808 DECISION PAGE 6 9/28/05**

56

1    prison too long.  But you need to keep the victim
2    foremost in your mind because he is dead, and he is
3    dead as a result of your actions.  And you also
4    referred to the crime as an accident and I tried to
5    explore that a little with you but you must also
6    keep in mind that this was not an accident, it was
7    a crime and the facts in the appeal are correct and
8    we have no reason to believe that they are not.
9    This was a deliberate crime.  The inmate has a
10   history of criminality which includes carrying
11   concealed weapons, robbery, grand theft auto, and
12   you were also on probation at the time of
13   commitment offense.  The inmate has not complete
14   the necessary programming which is essential to his
15   adjustment and needs additional time to gain such
16   (indiscernible) and you failed to complete any
17   vocations.  Therefore, a longer period of
18   observation and evaluation is required before the
19   board should find that he is suitable for parole.
20   And the panel recommends that you remain
21   disciplinary free.  If available, upgrade
22   vocationally and educationally.  And if available
23   participate in self help therapy programming.
24   Earlier in one of your statements, I think it was
25   your closing statement, that you mentioned you
26   didn't know what to do to get out of prison, that
27   **BENJAMIN HERNANDEZ E-51808 DECISION PAGE 7 9/28/05**

57

1  you felt that you were ready to get out of prison.
2  I think that Commissioner Mejia is going to give
3  you some more suggestions as to how you might
4  accomplish that.
5       **DEPUTY COMMISSIONER MEJIA:**  Okay.  Mr.
6  Hernandez, you have been incarcerated at CDC for
7  over 15 years now and it is like the commissioner
8  said, 15 years you have not completed any
9  marketable skills or any vocation.  We know that
10  you have (indiscernible) for the GED however you
11  failed the first time and didn't try again.  I
12  think the most disturbing thing about this hearing
13  that really affected our decision is your lack of
14  remorse and lack of insight.  I think that you
15  should go back and get all the records and really
16  contemplate, do introspection and make a decision
17  on how you are going to present yourself for the
18  next hearing on what the facts of the case is.  You
19  don't have to admit or deny, if you don't want to
20  talk about it that's fine.  However, if you are
21  going to talk about it, we expect you to be more
22  truthful and (indiscernible) because there are some
23  inconsistencies and minimization that you present
24  in this hearing.  And good luck to you Sir.
25  //
26  //
27  **BENJAMIN HERNANDEZ E-51808 DECISION PAGE 8  9/28/0**

58

1    **PRESIDING COMMISSIONER ST. JULIEN:**  Good luck Sir.

2    The time is 1:45 and I will recess, or we're

3    adjourned.

4                              --oOo--

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    **PAROLE DENIED FOUR YEARS**

24    **THIS DECISION WILL BE FINAL ON:**_____

25    **YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT**

26    **DATE, THE DECISION IS MODIFIED.**

27    **BENJAMIN HERNANDEZ E-51808 DECISION PAGE 9 9/28/05**

59

CERTIFICATE AND
DECLARATION OF TRANSCRIBER


I, SUE GERDES, a duly designated transcriber,

PETERS SHORTHAND REPORTING, do hereby declare and

certify under penalty of perjury that I have

transcribed tape(s) which total one in number and

cover a total of pages numbered 1 - 56, and which

recording was duly recorded at CORRECTIONAL TRAINING

FACILITY, SOLEDAD, CALIFORNIA, in the matter of the

SUBSEQUENT PAROLE CONSIDERATION HEARING OF BENJAMIN

HERNANDEZ, CDC NO. E-51808, ON SEPTEMBER 28, 2005, and

that the foregoing pages constitute a true, complete,

and accurate transcription of the aforementioned tape

to the best of my ability.

I hereby certify that I am a disinterested

party in the above-mentioned matter and have no

interest in the outcome of the hearing.

Dated OCTOBER 14, 2005, at SACRAMENTO,

California.


SUE GERDES
TRANSCRIBER
**PETERS SHORTHAND REPORTING**

EXHIBIT 'B'

# EXHIBIT – B

The Board is composed of 17 Commissioners, and a Executive Director who is appointed by the Governor. They conduct parole consideration hearings for inmates sentenced to life terms with the possibility of parole. The Commissioners, as voting members of the BPH, establish terms and conditions of parole for all persons released on parole and may make recommendations to the Governor for pardons and executive clemency.

**For full biographical information, please click below:**

- Joyce Arredondo
- Archie "Joe" Biggers
- Sandra Bryson
- Terry Farmer
- Jack Garner
- Philip S. Inglee
- Stephen Lee
- Margarita Esabel Perez
- Chuck J. Supple
- Thomas Sawyer
- Tracey L. St. Julien

**Susan L. Fisher**

Susan L. Fisher, 52, of Sacramento County, has been appointed chair of the Board of Parole Hearings. She was appointed to the Board in July 2005 and previously served as a commissioner on the Board of Prison Terms from January 2004. From 1999 to 2004 she served as executive director of the Doris Tate Crime Victims Bureau and, before that, served on the Bureau's board of directors for seven years. She also served as president of Citizens for Law and Order. This position requires Senate confirmation and the compensation is $99,693. Fisher is a Republican.

Stephen Lee, 50, of Los Angeles County, has served on the Board of Prison Terms since 2005. Prior to that, he was a Los Angeles Superior Court Referee for seven years, where he handled all matters assigned in the Dependency and Juvenile Delinquency Court. Lee was a senior trial litigator for Lee & Associates from 1991 to 1995 and prior to that was a senior deputy district attorney for Los Angeles County from 1986 to 1991. Lee's experience also includes one year as senior misdemeanor trial deputy for the San Joaquin District Attorney's Office and three years as a general civil and immigration attorney. Lee is a Republican. He will hear adult matters.



### Margarita Esabel Perez

Margarita Esabel Perez, 42, of El Dorado County, has served as chairperson of the Board of Prison Terms since January 2004. From 2001 to 2004 she served as a senior investigator and parole agent in the investigations division. Perez served from 1996 to 2001 as a parole agent at the Department of Corrections. She began her career in law enforcement as a correctional officer, first at Avenal State Prison and later as a correctional sergeant at the Transportation Unit Based at Folsom State Prison. Perez is a former captain with the California Army National Guard. She served on active duty during Operation Desert Storm and volunteered for active duty following the terrorist attacks of September 11th. Perez is a Democrat. She will hear adult matters.



### Chuck J. Supple

Chuck J. Supple, 46, of Sacramento County, has served on the Youth Authority Board since 2003. Previously, he was director of the then-Governor's Office of Service and Volunteerism, now the California Service Corps. Prior to that, Supple served for five years as president and chief executive officer of Public Allies, Inc., a non-profit organization that develops community leadership skills among young adults. He is also currently a board member of the Tavis Smiley Foundation. Supple is a Democrat. He will hear juvenile matters.

### Thomas C. Sawyer

Thomas C. Sawyer, 61, of San Joaquin County, served as a California Highway Patrol officer for more than 20 years before being elected the Sheriff-Coroner of Merced County in 1990. He served as sheriff for 11 years before his retirement in 2001. Most recently, he has been a consultant for Advanced Interactive Systems where he performed airport security training around the United States and with the Facility Group on project management and criminal justice planning. Sawyer is a member of the California State Sheriffs' Association, the National Sheriffs' Association and the International Police Chiefs' Association. Sawyer is a Republican. He will hear adult matters.

### Tracey L. St. Julien

Tracey L. St. Julien, 46, of Sacramento County, has been executive director of the American College of Obstetricians and Gynecologists, a nonprofit organization founded to promote advances in women's healthcare, since 2001. Previously, she was a consultant for Glaxo Wellcome, Incorporated and, from 1997 to 2001 owned and operated Gilded Age Tours, an international travel tour company. St. Julien served on the staff of California State Assemblymembers Curtis Tucker, Sr. and Curtis Tucker, Jr., first as a legislative assistant and then as chief of staff. In this capacity she oversaw the 1992 Assembly Task Force on the Los Angeles Riots. St. Julien is a Democrat. She will hear adult matters.

### Dennis Kenneally

Dennis Kenneally, 59, of San Diego County, most recently served as advisor to the president and chief executive officer of Maxim Systems, Inc. and staff for Forfeiture Support Associates. Previously, he served for three years as commanding general and assistant adjutant general of the California National Guard. From 1995 to 2001 Kenneally was vice president of Pedus Services, where he was responsible for mergers, acquisitions and management and administrative services. Kenneally served for three years with the San Diego Sheriff's Department first as a special assistant and later as chief deputy and assistant sheriff. His experience also includes six years as deputy assistant secretary for the United States Department of the Air Force. Kenneally joined the armed forces in 1963 serving for a total of 42 years. This position requires Senate confirmation and the compensation is $111,768. Kenneally is a Republican.

Joyce Arredondo, 50, of Sacramento County, has served as a commissioner on the Youth Authority since January 2004. Prior to that, Arredondo was the executive director of the North Area Teen Center, a nonprofit organization that provides after-school opportunities for tutoring, employment development, sports activities, cultural opportunities and field trips for junior and senior high school students, from 1997 to 2004. She has also served as a member of the Building Bridges Initiative Advisory Board for the San Juan Unified School District. Arredondo is a Republican. She will hear juvenile matters.

### Archie "Joe" Biggers

Archie "Joe" Biggers, 61, of San Diego County, has served on the Youth Authority Board since 2005. Prior to that, he served as executive director of the Greater San Diego Inner-City Games. Biggers served for 24 years in the United States Marine Corps, retiring in 1991 as a lieutenant colonel. From 1992 to 1994 he was operations director for the San Diego Police Athletic League and from 1994 to 1996 was executive director of the S.T.A.R. program (Sports Training, Academic & Recreation). Biggers is active in many community organizations including the San Diego Unified School Interscholastic Athletics Council and the San Diego Marine Corps Historical Society Board. He is also a past member of the San Diego Crime Commission, the Social Service Advisory Board of San Diego County and the Girl Scouts Council of San Diego and Imperial Counties. Biggers is a Republican. He will hear juvenile matters.

### Sandra Bryson

Sandra Bryson, 60, of Markleeville, most recently served as a support services and reserve deputy for the Alpine County Sheriff's Department. Since 1986, Bryson has served as director of Bryson and Associates, a law enforcement and canine consulting company that includes among its clients the Office of Emergency Services and the Federal Emergency Management Agency. She is also an instructor for California Peace Officer Standards and Training. Bryson is a member of the California Narcotics Officers Association and the National Association of Search and Rescue. This position requires Senate confirmation and the compensation is $99,693. Bryson is a Democrat. She will hear adult matters.

### Terry R. Farmer

Terry R. Farmer, 61, of Sacramento County, has been chief counsel to the Board of Prison Terms since June 2003. From 1983 to 2003 he served as Humboldt County district attorney. Farmer served as a partner in the law firm of Stokes, Steeves, Warren, Farmer and Jensen from 1978 to 1982 and as a Humboldt County deputy district attorney from 1975 to 1978. He is a member of the California State Bar. Farmer is a Democrat. He will hear adult matters.

### Jack Garner

Jack Garner, 61, of Gold River, has been appointed to the Board of Parole Hearings to hear Adult matters. He is currently the bureau chief for the Commission on Peace Officer Standards and Training. Garner has served with the Commission since 1990, beginning his tenure as senior law enforcement consultant. He was previously the city manager and chief of police for the City of Martinez. Garner is a member of the FBI National Academy of Graduates Association, the California Police Chiefs Association and the California Peace Officers Association. This position requires Senate confirmation and the compensation is $99,693. Garner is a Republican.

### Philip S. Inglee

Philip S. Inglee, 68, of Orange County, has served on the Board of Prison Terms since 2005. Prior to that, he served as a commissioner on the Orange County Parole Board from 2001 to 2005. Inglee worked as a banking executive for 33 years, serving as president and chief executive officer of Liberty National Bank from 1982 to 1998. In addition, he has served as chair of the Huntington Beach Planning Commission and as foreman of the Orange County Grand Jury from 1999 to 2000. He served as an officer in the United States Marine Corps from 1959 to 1962 on active duty and as a member of the reserves from 1962 until his retirement as a colonel in 1989. Inglee is a Republican. He will hear adult matters.



**California Home**                                                                    Thursday



Welcome to *California*

**CDCR Home**
**Victims**
**Visitors**
**Offenders**
**Rehabilitation**
**News**
**About CDCR**
**Divisions & Boards**

  **Adult Operations**

  **Adult Programs**

  Board Of Parole Hearings

  **Juvenile Justice**

  **Prison Industry Authority**

  **Corrections Standards Authority**

  **Office of Legal Affairs**

**Career Opportunities**
**Reports & Research**
**Budget & Regulations**
**Community Resource Directory**
**Contact Us**

*California*
**Department of Corrections**
*and* **Rehabilitation**

○ My CA



Schw

**BOPH Links**

- **Home**
- **Chairman**
- **Commissic**
- **Deputy Co**
- **Divisions &**
- **En Banc De**
- **Regulatory**
- **Legislative**
- **Parole Hea**
- **Attorney/In**
  **Services**

### Commissioners

**James Davis**

James Davis, 53, of El Cajon, has served on the Board since February 2006 and is currently a consultant for Civilian Police International and Citygate Associates. Davis previously served for 30 years in the El Cajon Police Department, beginning as a patrol officer in 1974 and retiring in 2004 after four years as chief of police. He is the co-founder, past president and a board member of the El Cajon Youth Development Advisory Council and a former chair of the Automated Regional Justice Information System Management Committee. This position requires Senate confirmation and the compensation is $103,317. Davis is a Republican. He will hear adult matters

Updated: 04/12/2007
Back to Top of Page

© 2005 State of California. Conditions of Use  Privacy Policy

Commissioners

**California Home**                                                                 Thursday

Welcome to *California*

**CDCR Home**
**Victims**
**Visitors**
**Offenders**
**Rehabilitation**
**News**
**About CDCR**
**Divisions & Boards**
 **Adult Operations**

 **Adult Programs**

 Board Of Parole Hearings

 **Juvenile Justice**
 **Prison Industry**
 **Authority**
 **Corrections Standards**
 **Authority**
 **Office of Legal Affairs**
**Career Opportunities**
**Reports & Research**
**Budget & Regulations**
**Community Resource**
**Directory**
**Contact Us**



California
Department of Corrections
and Rehabilitation



 **Commissioners**

 **Sandra Bryson**

 Sandra Bryson, 60, of Markleeville, most recently served as a support services
 and reserve deputy for the Alpine County Sheriff's Department. Since 1986,
 Bryson has served as director of Bryson and Associates, a law enforcement
 and canine consulting company that includes among its clients the Office of
 Emergency Services and the Federal Emergency Management Agency. She is
 also an instructor for California Peace Officer Standards and Training. Bryson is
 a member of the California Narcotics Officers Association and the National
 Association of Search and Rescue. This position requires Senate confirmation
 and the compensation is $99,693. Bryson is a Democrat. She will hear adult
 matters.

**BOPH Links**

● **Home**
● **Chairman**
● **Commissic**
● **Deputy Co**
● **Divisions &**
● **En Banc D**
● **Regulatory**
● **Legislative**
● **Parole Hea**
● **Attorney/In**
 **Services**

Updated: 04/12/2007
Back to Top of Page

© 2005 State of California. Conditions of Use  Privacy Policy

California Home                                                                                Thursday



**CDCR Home**
**Victims**
**Visitors**
**Offenders**
**Rehabilitation**
**News**
**About CDCR**
**Divisions & Boards**
 **Adult Operations**
 **Adult Programs**
 Board Of Parole Hearings
 **Juvenile Justice**
 **Prison Industry
 Authority**
 **Corrections Standards
 Authority**
 **Office of Legal Affairs**
**Career Opportunities**
**Reports & Research**
**Budget & Regulations**
**Community Resource
Directory**
**Contact Us**

California
**Department of Corrections**
*and* **Rehabilitation**



### Commissioners

**Philip S. Inglee**

Philip S. Inglee, 68, of Orange County, has
served on the Board of Prison Terms since
2005. Prior to that, he served as a commissioner
on the Orange County Parole Board from 2001
to 2005. Inglee worked as a banking executive
for 33 years, serving as president and chief
executive officer of Liberty National Bank from
1982 to 1998. In addition, he has served as
chair of the Huntington Beach Planning
Commission and as foreman of the Orange
County Grand Jury from 1999 to 2000. He
served as an officer in the United States Marine
Corps from 1959 to 1962 on active duty and as
a member of the reserves from 1962 until his
retirement as a colonel in 1989. Inglee is a
Republican. He will hear adult matters.



**BOPH Links**

- **Home**
- **Chairman**
- **Commissic**
- **Deputy Co**
- **Divisions &**
- **En Banc D**
- **Regulatory**
- **Legislative**
- **Parole Hea**
- **Attorney/In
  Services**

Updated: 04/12/2007
Back to Top of Page

© 2005 State of California. Conditions of Use  Privacy Policy

California Home                                                                                  Thursday



CDCR Home
**Victims**
**Visitors**
**Offenders**
**Rehabilitation**
**News**
**About CDCR**
**Divisions & Boards**
  **Adult Operations**

  **Adult Programs**

  Board Of Parole Hearings

  **Juvenile Justice**
  **Prison Industry
  Authority**
  **Corrections Standards
  Authority**
  **Office of Legal Affairs**
**Career Opportunities**
**Reports & Research**
**Budget & Regulations**
**Community Resource
Directory**
**Contact Us**



### California
# Department of Corrections
### and Rehabilitation

○ My CA

Schw

**BOPH Links**

● **Home**
● **Chairman**
● **Commissic**
● **Deputy Co**
● **Divisions &**
● **En Banc De**
● **Regulatory**
● **Legislative**
● **Parole Hea**
● **Attorney/In**
  **Services**

### Commissioners

#### Darcel Woods

Darcel Woods, 47, of La Verne, has served as a professor in the correctional science department at Chaffey College since 1995 and currently serves as department co-chair. From 1994 to 2003, Woods served as a project specialist for the Baldy View Regional Occupational Program, where she coordinated The Success Project, a correctional reintegration program. Prior to that, she was a parole agent for the California Youth Authority, now the Division of Juvenile Justice, from 1989 to 1994. Woods began her career as a deputy sheriff with the Los Angeles County Sheriff's Department in 1982. This position requires Senate confirmation and the compensation is $108,167. Woods is a Democrat. She will hear adult matters.

Updated: 04/12/2007
Back to Top of Page

© 2005 State of California. Conditions of Use  Privacy Policy

California Home                                                                                    Thursday



**Welcome to** *California*

### CDCR Home
### Victims
### Visitors
### Offenders
### Rehabilitation
### News
### About CDCR
### Divisions & Boards
  Adult Operations
  Adult Programs
  Board Of Parole Hearings
### Juvenile Justice
### Prison Industry Authority
### Corrections Standards Authority
### Office of Legal Affairs
### Career Opportunities
### Reports & Research
### Budget & Regulations
### Community Resource Directory
### Contact Us

*California* **Department of Corrections** *and* **Rehabilitation**



○ My CA

Schw Ci

**BOPH Links**

- **Home**
- **Chairman**
- **Commissic**
- **Deputy Con**
- **Divisions &**
- **En Banc D**
- **Regulatory**
- **Legislative**
- **Parole Hea**
- **Attorney/In Services**

### Commissioners

**Michael Prizmich**

Michael Prizmich, 61, of Plymouth, retired from the Amador County Sheriff's Department in 2006, where he served since 1976, starting as a deputy before moving through the ranks and eventually reaching the position of sheriff in 1995. Prizmich also served as the director of personnel and risk management for Amador County from 1984 to1990. He began his career in law enforcement with the Oakland Police Department in 1971. Prizmich has been a member of the Board of Corrections and the Off-Highway Vehicle Commission. This position requires Senate confirmation and the compensation is $108,167. Prizmich is a Republican. He will hear adult matters.

Updated: 04/12/2007
Back to Top of Page

© 2005 State of California. Conditions of Use  Privacy Policy

**California Home**                                    Thursday

Welcome to *California*

**CDCR Home**
**Victims**
**Visitors**
**Offenders**
**Rehabilitation**
**News**
**About CDCR**
**Divisions & Boards**
 **Adult Operations**
 **Adult Programs**
 Board Of Parole Hearings
 **Juvenile Justice**
 **Prison Industry Authority**
 **Corrections Standards Authority**
 **Office of Legal Affairs**
**Career Opportunities**
**Reports & Research**
**Budget & Regulations**
**Community Resource Directory**
**Contact Us**



California
**Department *of* Corrections**
***and* Rehabilitation**



◯ My CA

Schw
ell

**BOPH Links**

- **Home**
- **Chairman**
- **Commissic**
- **Deputy Co**
- **Divisions &**
- **En Banc D**
- **Regulatory**
- **Legislative**
- **Parole Hea**
- **Attorney/In Services**

 Commissioners

 **Linda Shelton**

Linda Shelton, 55, of Redding, has served as chief probation officer for Glenn County since 1999. Shelton was a division director responsible for the Shasta County Juvenile Hall from 1990 to 1999. She joined the Shasta County Probation Department as a deputy probation officer in 1980. Shelton is past president of the Chief Probation Officers of California and was a faculty member for the Shasta College Administration of Justice Department from 1992 to 1998. The compensation is $99,693. Shelton is a Democrat. She will hear adult matters.

Updated: 04/12/2007
Back to Top of Page

© 2005 State of California. Conditions of Use  Privacy Policy

California Home                                                    Thursday


Welcome to *California*

**CDCR Home**
**Victims**
**Visitors**
**Offenders**
**Rehabilitation**
**News**
**About CDCR**
**Divisions & Boards**
 **Adult Operations**
 **Adult Programs**
 Board Of Parole Hearings
 **Juvenile Justice**
 **Prison Industry Authority**
 **Corrections Standards Authority**
 **Office of Legal Affairs**
**Career Opportunities**
**Reports & Research**
**Budget & Regulations**
**Community Resource Directory**
**Contact Us**


California
**Department** *of* **Corrections**
*and* **Rehabilitation**

**Commissioners**

**Edward Martinez**

Edward Martinez, 48, of Modesto, has been self-employed as a private investigator with EM Investigations since 2005. Martinez previously was a field investigator with the workers' compensation firm Freese & Gianelli from 2000 to 2005, deputy sheriff and detective for the Stanislaus County Sheriff's Department from 1992 to 2000 and deputy sheriff for the Orange County Sheriff's Department from 1982 to 1992. This position requires Senate confirmation and the compensation is $99,693. Martinez is a Republican. He will hear adult matters.


○ My CA
Schw

**BOPH Links**

● **Home**
● **Chairman**
● **Commissi**
● **Deputy Co**
● **Divisions &**
● **En Banc D**
● **Regulatory**
● **Legislative**
● **Parole Hea**
● **Attorney/In**
  **Services**

Updated: 04/12/2007
Back to Top of Page

© 2005 State of California. Conditions of Use  Privacy Policy

California Home                                                    Thursday



# Welcome to California

**CDCR Home**
**Victims**
**Visitors**
**Offenders**
**Rehabilitation**
**News**
**About CDCR**
**Divisions & Boards**
  **Adult Operations**
  **Adult Programs**
  Board Of Parole Hearings
  **Juvenile Justice**
  **Prison Industry Authority**
  **Corrections Standards Authority**
  **Office of Legal Affairs**
**Career Opportunities**
**Reports & Research**
**Budget & Regulations**
**Community Resource Directory**
**Contact Us**

## California Department of Corrections and Rehabilitation



### Commissioners

**A. Stanley Kubochi**

A. Stanley Kubochi, 59, of Sacramento, has served as principal district attorney for the Sacramento County District Attorney's Office since 2004. Kubochi has served as a deputy district attorney for the Sacramento County District Attorney's Office since 1985, where he has held assignments in the prison crimes unit, public assistance fraud unit, misdemeanor unit and felony trails. Previously, he served as an assistant public defender for the Sacramento County Public Defender's Office from 1973 to 1985. This position requires Senate confirmation and the compensation is $108,167. Kubochi is a Republican. Kubochi will hear adult matters.

**BOPH Links**

- **Home**
- **Chairman**
- **Commissi**
- **Deputy Co**
- **Divisions &**
- **En Banc D**
- **Regulatory**
- **Legislative**
- **Parole Hea**
- **Attorney/In Services**

Updated: 04/12/2007
Back to Top of Page

© 2005 State of California. Conditions of Use Privacy Policy

**California Home**                                                                                    Thursday

Welcome to *California*

**CDCR Home**
**Victims**
**Visitors**
**Offenders**
**Rehabilitation**
**News**
**About CDCR**
**Divisions & Boards**
  **Adult Operations**
  **Adult Programs**
  Board Of Parole Hearings
  **Juvenile Justice**
  **Prison Industry Authority**
  **Corrections Standards Authority**
  **Office of Legal Affairs**
**Career Opportunities**
**Reports & Research**
**Budget & Regulations**
**Community Resource Directory**
**Contact Us**



*California*
**Department of Corrections**
*and* **Rehabilitation**



○ My CA

Sch

### Commissioners

**Jack Garner**

Jack Garner, 61, of Gold River, has been appointed to the Board of Parole Hearings to hear Adult matters. He is currently the bureau chief for the Commission on Peace Officer Standards and Training. Garner has served with the Commission since 1990, beginning his tenure as senior law enforcement consultant. He was previously the city manager and chief of police for the City of Martinez. Garner is a member of the FBI National Academy of Graduates Association, the California Police Chiefs Association and the California Peace Officers Association. This position requires Senate confirmation and the compensation is $99,693. Garner is a Republican.

**BOPH Links**

- **Home**
- **Chairman**
- **Commissic**
- **Deputy Co**
- **Divisions &**
- **En Banc D**
- **Regulatory**
- **Legislative**
- **Parole Hea**
- **Attorney/In**
  **Services**

Updated: 04/12/2007
Back to Top of Page

© 2005 State of California. Conditions of Use  Privacy Policy

**California Home**                                                         Thursday

Welcome to *California*

**CDCR Home**

**Victims**

**Visitors**

**Offenders**

**Rehabilitation**

**News**

**About CDCR**

**Divisions & Boards**

  **Adult Operations**

  **Adult Programs**

  Board Of Parole Hearings

  **Juvenile Justice**

  **Prison Industry Authority**

  **Corrections Standards Authority**

  **Office of Legal Affairs**

**Career Opportunities**

**Reports & Research**

**Budget & Regulations**

**Community Resource Directory**

**Contact Us**



*California*
**Department** *of* **Corrections**
*and* **Rehabilitation**



**Commissioners**

**Janice Eng**

Janice Eng has served as director of operations for the marketing and advertisement firm Trade Management Group since 2003. Prior to that, Eng was managing partner of HealthStar from 2001 to 2002, executive director of Intriguard, a division of California Medical Review from 1998 to 2001, principal of the consulting firm Eng Enterprises from 1995 to 1998 and director of quality and customer satisfaction for the Baxtor Healthcare Corporation from 1989 to 1995. This position requires Senate confirmation and the compensation is $99,693. Eng is a Democrat. She will hear adult matters.

◯  My CA

Sch
cli

**BOPH Links**

• **Home**

• **Chairman**

• **Commissic**

• **Deputy Cor**

• **Divisions &**

• **En Banc De**

• **Regulatory**

• **Legislative**

• **Parole Hea**

• **Attorney/In Services**

Updated: 04/12/2007
Back to Top of Page

© 2005 State of California. Conditions of Use  Privacy Policy

EXHIBIT   C

EXHIBIT   C

EXHIBIT   C

# DECLARATION OF MONICA KNOX

I, MONICA KNOX, declare as follows:

1. I am a Deputy Federal Public Defender and, together with Deputy Federal Public Defender Guy Iversen, I represent petitioner in this matter.

2. The factual disputes underlying petitioner's claims center on whether there is a policy and/or practice of the Board of Prison Terms to deny findings of suitability and parole dates to prisoners serving life terms; petitioner claims there is such a policy and/or practice and that is the reason he has been denied parole; respondent claims there is no such policy and/or practice.

3. Earlier discovery orders by this court gave us access to, among other things, the transcripts of parole suitability hearings held between 1995 and 2000 as well as the "lifer packets," i.e., the accompanying material the Board relies on to determine suitability. We have read, by random selection, over 300 of those transcripts and reviewed the accompanying lifer packets. We have tabulated the results of 284 of those cases (the others not being tabulated because they were stipulated findings of unsuitability, usually in exchange for a shorter denial period). The tabulated results appear as Exhibit A.

4. The tabulated results, we believe, are strong evidence that there is in fact a policy and/or practice by the Board of finding all lifers unsuitable for parole. Some of the significant findings in the 284 cases are as follows:

A. 283 were found unsuitable for parole

B. All 283 were found unsuitable based, first and primarily, on the offense

C. 277 were found unsuitable because their offenses were considered cruel and/or callous or for no reason at all as specified in the regulations

D. Although the Board found each and every offense to be cause to find the lifer unsuitable, the offenses ranged from planned, premeditated murders and torture or execution murders to accidental killings or kidnaps without any injury at all.

E. Although the Board almost always gave secondary reasons for the findings of unsuitability, those reasons were often not supported by the facts or were so questionable given the facts that they suggested the Board was simply reaching for anything less than positive about

6

2 /13

1   the lifer. For example. the Board would cite the lifer's disciplinary history in prison as a reason
2   for finding him unsuitable despite the fact that the lifer may not have had any disciplinary action
3   in many years or may have had disciplinary actions for only trivial matters (such as using a bed
4   sheet for a clothesline or being late to work). The Board would cite the lifer's "escalating pattern
5   of criminal history" as a reason for finding him unsuitable despite the fact that the lifer may have
6   no prior convictions or only minor (non-violent misdemeanor) convictions. The Board would
7   cite an unfavorable psychological report as a concern regarding suitability despite the fact that
8   the lifer's psych report would assess him as an average or below average risk of danger.

9          F. Of the 283 lifers found unsuitable

10              12 had no prior record at all. no disciplinaries of any kind in prison. psych
11  reports of average or low risk of danger. programming (self-help programs and work) in prison
12  and release plans

13              4 had no prior record at all. no disciplinary actions in the last 10 years. a
14  psych report of average or low risk. programming (self-help programs and work) in prison and
15  release plans

16              18 had only minor prior record (just arrests or just non-violent juvenile
17  actions). no disciplinary actions in the last 10 years. a psych report of average or low risk.
18  programming (self-help programs and work) in prison and release plans

19              11 had more serious prior records (felony convictions) but had been
20  disciplinary free for at least 10 years. had a psych report of low risk of danger. had programmed
21  (self-help and work) and had release plans

22          5. Although we are continuing to review transcripts. we believe. based on the data we
23  already have, that information held by current and former commissioners, current and former
24  deputy commissioners and current and former executive directors is critical. In particular. we
25  need to explore with these person how they understood their jobs relative to suitability hearings
26  for lifers. We have reason to believe that many. if not all. of them have understood their jobs
27  in the last ten years to be to find all lifers unsuitable for parole.

28

7

1        11. Mr. Leddy explained that he was chastised by former executive officer Patterson for

2    giving "too many" parole dates to lifers. (Exhibit B at 71-72.)

3        12. Based on the foregoing, we have reason to believe that the current and former

4    commissioners have relevant and critical information regarding the practices and unwritten

5    policies of the Board in making parole determinations for lifers. However, it appears that they

6    are unwilling to voluntarily provide the information.

7        13. When I spoke with Mr. Leddy last year, he indicated that he believed a few of the

8    former or current commissioners and deputy commissioners would be willing to talk with me.

9    He later advised me, however, that he had checked with them and they had told him they would

10   be willing to talk and answer questions only if subpoenaed and required to do so.

11       14. Respondent's counsel herein, Deputy Attorney General Barbara Spiegel, has advised

12   us that she will "not agree to allow" the deposition of the former or current commissioners,

13   deputy commissioners or others we want to speak with.

14       15. There is a proceeding pending in the Eastern District of California, a habeas petition

15   filed by a lifer, raising the same claims as raised in this proceeding regarding the Board's

16   practice and/or policy of refusing to find suitable for parole any lifer. Melvin Coleman v.

17   California Board of Prison Terms, CV-S-96-783 LKK PAN P. A request to depose some

18   current and former commissioners and deputy commissioners is pending in that action. At a

19   hearing on February 28, 2001, counsel for the Board in that case indicated that the Board

20   Chairman had sent a letter to current and former commissioners and deputy commissioners

21   advising them to contact the Board and/or the Attorney General's office if they were contacted

22   by any defense attorney seeking to speak with them about lifer hearings. The Attorney General's

23   office, in the Eastern District case, in the San Diego Superior Court case and apparently in this

24   case, has instructed current and former commissioners and deputy commissioners not to speak

25   with defense counsel (although recently, after a ruling by the magistrate in the Eastern District

26   case, that deputy attorney general agreed that she would no longer instruct former

27   commissioners and deputy commissioners not to speak).

28

2/3

1    16. Based on the foregoing, we will need an order for this Court allowing us to subpoena

2    to deposition the current and former commissioners and deputy commissioners and others we

3    need to interview in order to get the relevant information we have reason to believe they hold.

4    17. We have not filed a Joint Stipulation re: Discovery relative to depositions at this

5    point because we believed that we should first seek permission under Rule 6 for leave to conduct

6    depositions. As soon as we receive that leave, we will serve on respondent's counsel our portion

7    of a Joint Stipulation, obtain her portion and file it with the Court (assuming there are any

8    disagreements about depositions).

9    I declare the foregoing is true and correct.

10    Executed under penalty of perjury this 24th day of April, 2001, at Los Angeles,

11    California.

12

13

14    MONICA KNOX
     Deputy Federal Public Defender

15

16

17

18

19

20

21

22

23

24

25

26

27

28

E X H I B I T     ' D '

E X H I B I T     D

STATE OF CALIFORNIA
COUNTY OF SAN LUIS OBISPO

## DECLARATION OF ALBERT M. LEDDY

I, ALBERT M. LEDDY, hereby declare:

1) I was an attorney at law, currently retired. After graduating from Boalt Hall, University of California at Berkeley, I practiced law until 1983 including serving as Deputy District Attorney and then District Attorney of Kern County, California, from 1952 to 1965 and again from 1970 to 1983.

2) Between 1983 to 1992 I served as a Commissioner and then as Chairman of the Board of Prison Terms (BPT) pursuant to my appointment and re-appointments to those positions by Governor George Deukmejian.

3) During approximately 9 years of service as BPT Chairman and Commissioner, parole hearings were conducted as now for "life" prisoners (with a maximum prison term of life and a minimum of between 7 and 25 years, reduced for work and good behavior), by 3-member BPT panels at intervals prescribed by the California Penal Code statutes and the parole regulations in the Code of Regulations, Title 15, Division 2, Board of Prison Terms, §§ 2000 et seq.

4) From 1983 to 1990 BPT panels became more reluctant to grant paroles in accordance with Penal Code § 3041(a) (which requires that at the initial hearing a parole date "shall normally" be set), resulting in a substantial steady decline in the percentage of parole dates granted at hearings. This decline was caused by increasing political pressure and new BPT Commissioner appointees who disfavored paroling life prisoners.

5) After Governor Wilson's election in 1990, he substantially intervened to reduce parole grants; in actual effect his policy practically eliminated paroles. He accomplished this, first, by appointing and re-appointing BPT Commissioners known to disfavor parole or to favor a "no-parole" policy. These appointees were all crime victims, former law enforcement personnel or Republican legislators who had been defeated in elections and needed a job.

6) Governor Wilson made his "no-parole" policy known in several ways including, I believe, through statements quoted by the media and possibly through the Youth and Adult Correctional Agency Secretary, although I can't say I know this to be fact. I am aware that he wanted previously set parole dates rescinded.





103

<u>Declaration of Albert M. Leddy</u>

7) The new BPT appointments by Governor Wilson violated Penal Code § 5075 which required that "[t]he selection of persons and their appointment by the Governor and confirmation by the Senate shall reflect as nearly as possible a cross-section of the racial, sexual, economic, and geographical features of the population of the state." Governor Wilson's appointments have been mostly from his home area of San Diego. Most are not qualified by training or experience for the position of BPT Commissioner, and they do not fulfill the statutory cross-section requirements of racial, sexual, economic or geographical proportion.

8) My knowledge of these facts is based on publication and my awareness of said appointments, my daily dealings with them as panel members at BPT hearings at which paroles were denied contrary to the laws and regulations, and Mr. Wilson's public statements disavowing parole policy as set forth in the statutes and regulations, and proclaiming during his campaigns that he would not have "another Willie Horton episode." On one occasion Joe Sandoval, former Secretary of YACA (a cabinet level appointment) personally warned the Commissioners to be careful about granting paroles. Chairman John Gillis told two Commissioners, "Stop giving these dates."

9) Governor Wilson also accomplished his "no-parole" policy by having the BPT use a previously unused law to void practically all grants of parole by BPT's panels, while not using it to overturn any decision denying parole. This law was Penal Code § 3041.2.

10) Governor Wilson also had the BPT use a seldom-used regulation, 15 CCR § 2451(c), to rescind nearly all of its previous grants of parole to prisoners awaiting their release. This regulation, known as the "improvident grant" clause, became routinely used to rescind those previously set dates. On one occasion, after I refused to recommend rescission on a panel, I was told by Ted Rich, BPT's Executive Officer, to recommend rescission when it is the Governor's desire. It was obvious to myself and other Commissioners that we would not be re-appointed if we did not comply.

11) At one point I became concerned enough about the "no-parole" policy that I wrote a 9-page brief about how we were not complying with the laws. I gave a copy to each Board member, pointing out that we could be sued. I asked that this brief be a topic on the Board's agenda. Ted Rich, as Executive Officer, said, "That's not going to be on the agenda. You can't have it on the agenda."

*104*



Declaration of  bert M. Leddy

Inasmuch as I expressed my dissatisfaction verbally and
in my brief, I'm sure that my objections helped me not to
get re-appointed.

12)  Accordingly, the effect that Governor Wilson has exerted
upon BPT personally, through his politically-based
policy, by his BPT appointments, and by his intervention
to rescind and reverse parole grants, has been to remove
any reasonable possibility of parole for practically all
of the thousands of California prisoners serving terms of
life with the possibility of parole.

13)  Such a "no-parole" policy is contrary to Penal Code §
3041 which requires that BPT "shall normally" set a
parole date in most cases, i.e., unless the prisoner is
shown to pose a threat to public safety, and that BPT
panels shall declare prisoners "suitable" for a future
release date and set that release date unless a
preponderance of the evidence presented at the hearing
demonstrates that the prisoner "will pose an unreasonable
risk of danger to society if released from prison."

14)  Although the reluctance to grant parole began in the
early 80's, under Governor Wilson's regime BPT panels,
denied parole in over 99% of cases by employing
procedures that violate the parole statutes and
regulations. Primarily used are offense factors. BPT
panels find prisoners "unsuitable" for parole based
mainly or entirely on the facts and circumstances of
their offense instead of their level of dangerousness, as
reflected by performance, rehabilitation and expert
evaluation in their prison records. Because the facts
and circumstances of crimes do not change, the procedure
effectively increases all such sentences from life with
possibility of parole to life without any possibility of
parole. Despite contrary regulations and statutes, BPT's
chief counsel and Executive Officer urged me and the
other Commissioners to deny paroles based on the
prisoners' offenses.

15)  The procedure also eliminates BPT's duty to set parole
dates because parole can't be granted for those found
"unsuitable." This renders illusory BPT's term-setting
obligation and lifers' opportunity to parole. Even the
most deserving prisoners shown overwhelmingly not to pose
an unreasonable risk (or any) risk of danger to the
public if released have not, cannot and will never
receive parole under such a policy.

16)  After 1992, when my final term as BPT Commissioner
expired, I re-entered the private practice of law. I
represented an inmate at his BPT hearing. Although the
inmate had a statutory right to call witnesses, who could
have refuted the allegations the panel used to deny

105



parole, the BPT denied the witness. Additionally, the BPT substituted Commissioner Carol Bentley, a former Assemblyperson who was appointed after she was not re-elected. I had never known Ms. Bentley to grant parole to any lifer. She was the panel chairperson. She was rude, her hostility was obvious and it was evident she was pre-determined to oppose parole.

17) Prior to the commencement of his parole hearing, I personally heard Ron Koenig, a Commissioner on the hearing panel and former BPT Chairman, inform Rick Erwood, the Riverside County District Attorney attending the hearing, "don't worry" because "we won't parole this guy," in those approximate words. This is consistent with my experience described above in which BPT's hearing panels often made decisions to deny parole prior to the hearings.

18) It has been clear to me that there is a general conspiracy to prevent life prisoners from paroling, especially those whose offenses include murder. Obviously, such a "no-parole" policy means that no murder offender can get a fair hearing as the law requires. If you can deny a prisoner "suitability" solely on the basis of the crime, you can deny him forever. The crime won't change. The parole law is based on the idea that prisoners do change, and become no danger to public safety. Statistically the murder offender—rarely repeats at crime once released.

19) As a taxpayer, I believe it is a waste of perhaps millions of dollars each year to incarcerate those life prisoners whose prison records adequately demonstrate they are no longer a threat to public safety. The correctional system spends millions on programs to teach them trades and marketable skills, to give them a general education, and until its discontinuation, psychological therapy to help them change their lives. I believe the law must be followed, that the Governor cannot create his own set of punishments in defiance of the clear legislative intent. Every man is entitled to a fair hearing where the burden of proof is set and adhered to, and the results are not just what is politically expedient for one person, the sitting governor.

20) I am informed that Governor Gray Davis has expressed his policy that no murder offender will be paroled on his watch. As a former Commissioner and as a lawyer, such a policy is clearly contrary to the statutes and



<u>Declaration of Albert M. Leddy</u>

regulations governing the parole process. Such a policy
will exacerbate an already unacceptable situation which
is backlogging hundreds, perhaps more, of life prisoners
who are already beyond the term they would normally have
served but for the "no-parole" policy.

I declare, under penalty of perjury, that the facts I
have stated are true and correct. My expressions of belief as
to each specified facts are based on the reasons I have given
as to each such fact. I would be willing to testify to same
in a court of law. I so swear, this _5T_ day of
_march_ 1999, at Los Osos, California.

Albert M. Leddy
Declarant

107

(251)

**EXHIBIT   E**

**EXHIBIT   E**

Lifers seek court allies in fight with state for parole - sacbee.com     Filed 04/16/2008 ...sacbee.com.sa...Page 271 of 8 print/story/555039.html

Case 1:08-cv-00347 Document 1-4



The Sacramento Bee

This story is taken from <u>Sacbee</u> / <u>Politics</u>.

# Lifers seek court allies in fight with state for parole

## Judges have overruled governor

**By Andy Furillo - <u>afurillo@sacbee.com</u>**
*Published 12:00 am PST Monday, December 10, 2007*

Frustrated by Gov. Arnold Schwarzenegger and his parole board, more California life-term prisoners are turning to the courts for another shot at freedom – and winning enough cases to put the state on edge.

In the past two years, at least seven convicts sentenced to life imprisonment have been freed on court-issued writs of habeas corpus, after the governor or his appointees on the Board of Parole Hearings had denied them release dates. About two dozen more have persuaded judges to order the governor or the board to review their decisions.

Those numbers pale compared with the thousands of lifers eligible for release dates whose parole applications have been rejected – 99.5 percent of them last year. But the state believes some judges are overstepping their authority, and the state attorney general's office has appealed three cases, which the state Supreme Court agreed to hear.

Senior Assistant Attorney General Julie Garland contends that in the past two years some lower courts have infringed on the executive authority of the governor and the board to decide which lifers get out and when, with the judges deciding on their own whether life-term inmates no longer are a danger to society and can be released.

"Some of these recent cases have opened the door, and attorneys might feel that by going to court, they might have another bite at the apple," Garland said.

At issue in the cases under appeal is the "standard of review" the state Supreme Court established in 2002 in the so-called Rosenkrantz case for lifers seeking parole. The dispute doesn't apply to the 3,500-plus prisoners sentenced to life without possibility of parole.

State law says the parole board "shall normally set" a release date for lifers who have a possibility of parole – more than 29,000 of whom are now behind bars – unless the "timing" or "gravity" of the current or past convictions "is such that consideration of the public safety requires a more lengthy period of incarceration."

The court's decision in the Rosenkrantz case set a precedent for lifers to seek judicial review of their parole decisions but restricted it to questioning whether there was "some evidence" to support the board or the governor's findings. It also established that the facts of the original crime were sufficient for a judge to make the call.

But in the case of convicted murderer Sandra Davis Lawrence, the 2nd District Court of Appeal in Los Angeles ruled earlier this year that the "ultimate test" of the law is whether the evidence could determine if the offender posed an unreasonable safety risk. The appellate panel ruled the evidence fell short and ordered Lawrence released. Her case is one of the three being appealed.

Garland characterized the courts' rulings on inmates' "suitability" for release as "a pretty big shift" from their established role of reviewing only the evidence on which the governor and

doesn't want to let any lifers out, it ought to pass a law to that effect.

"Let's debate it honestly and openly and see if it passes constitutional muster," said Michael Beckman, a Santa Monica attorney who represents lifers at their parole board hearings. "The way we're doing it now, it's intellectually dishonest to everybody."

As of the end of November, there were 29,607 life-term inmates doing time with a possibility of parole, according to the California Department of Corrections and Rehabilitation.

One was James Stockman, 49, a Washington man who has been in prison for 24 years on a 25-to-life, first-degree murder conviction for stabbing a man to death during a fight in Humboldt County. In January, the parole board approved Stockman for a release date. In June, the governor took it away.

"I was obviously very disappointed," said Stockman, in an interview at California State Prison, Solano. "I've worked very hard for this."

Stockman said he has earned a bachelor's degree in computer science and has never been disciplined in prison. He also said he is married and, if released, has an opportunity to get a computer-related job in Vacaville. He also claimed close ties to a Vacaville church.

George Rounds, 44, who has done 26 years on a 15-to-life conviction for the second-degree murder of his step-uncle, said the courts represent the last and best hope for lifers.

"So they're filing writs and petitions and starting to participate in the rule-making," he said.

Garland, the senior assistant attorney general, said lifers have been filing writs "for years," but it's only been in the past two years that they've enjoyed success.

If the state doesn't move to stop it now, she said, "more inmates would seek release in habeas corpus and would continue to be more successful."

Go to: Sacbee / Back to story

This article is protected by copyright and should not be printed or distributed for anything except personal use.
The Sacramento Bee, 2100 Q St., P.O. Box 15779, Sacramento, CA 95852
Phone: (916) 321-1000

Copyright © The Sacramento Bee

EXHIBIT F

EXHIBIT F

EXHIBIT F

**S156152**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

---

In re BENJAMIN HERNANDEZ on Habeas Corpus

---

The petition for writ of habeas corpus is denied.

George, C. J., and Corrigan, J., were absent and did not participate.

SUPREME COURT
**FILED**

FEB 2 7 2008

Frederick K. Ohlrich Clerk

---

Deputy

BAXTER
Acting Chief Justice

## PROOF OF SERVICE BY MAIL
### BY PERSON IN STATE CUSTODY
(C.C.P. §§ 1013(A), 2015,5)

I, BENJAMIN HERNANDEZ                          , declare:

I am over 18 years of age and I am party to this action.  I am a
resident of CORRECTIONAL TRAINING FACILITY prison, in the County
of Monterrey, State of California.  My prison address is:

> BENJAMIN HERNANDEZ , CDCR #: E-51808
> CORRECTIONAL TRAINING FACILITY
> P.O. BOX 689, CELL #: 7-319L
> SOLEDAD, CA 93960-0689.

On  March 24  2008,          , I served the attached:

PETITION FOR WRIT OF HABEAS CORPUS

on the parties herein by placing true and correct copies
thereof, enclosed in a sealed envelope (verified by prison
staff), with postage thereon fully paid, in the United States
Mail in a deposit box so provided at the above-named institution
in which I am presently confined.  The envelope was addressed as
follows:

UNITED STATES DISTRICT COURT
ATTN: CLERK OF THE COURT
U.S. COURTHOUSE
450 GOLDEN GATE AVE.
SAN FRANCISCO, CA 94102-3483

HON. EDMUND G. BROWN, JR.,
ATTORNEY GENERAL CALIFORNIA
ATTN: HABEAS CORPUS DESK (BPH)
POST OFFICE BOX 83266
SAN DIEGO, CA 92186-5266

I declare under penalty of perjury under the laws of the
State of California that the foregoing is true and correct.

Executed on  March 24, 2008  .

BENJAMIN HERNANDEZ
Declarant

BENJAMIN HERNANDEZ E51808
CTF II "c" Z-319
POST OFFICE BOX 689
SOLEDAD, CA 93960-0689

RECEIVED

APR 10 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

pro se

UNITED